107 F.3d 871
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jyoti SHAH, Plaintiff-Appellant,
v.
The UPJOHN COMPANY, Defendant-Appellee.
 Nos. 95-2337, 96-1079.
 United States Court of Appeals, Sixth Circuit.
 Feb. 28, 1997.
 
 Before: KENNEDY, JONES, and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 The plaintiff below, Jyoti Shah, filed suit against The Upjohn Company in the United States District Court for the Western District of Michigan, alleging that Upjohn violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., by terminating her employment as a research biochemist on the basis of her allergic reaction to certain chemicals or biological substances found in Upjohn's labs. The district court awarded summary judgment to Upjohn on Shah's ADA and related state law claims. In No. 95-2337, Shah appeals that award of summary judgment. In No. 96-1079, she appeals the district court's denial of her post-judgment motion to supplement the record with a revised version of her affidavit, which describes the jobs she believes her disability prevents her from performing. We affirm the district court in the former appeal, and dismiss the latter appeal as moot.
 
 
 2
 * Upjohn hired Shah as a biochemistry assistant in February 1980. Since 1987, she has served as a research biochemist, a position that requires laboratory work. In June 1990, Shah underwent a routine physical examination at Upjohn's Occupational Health (OH) clinic. A blood test taken as part of that examination revealed that Shah had an elevated count of white blood cells, or eosinophils. Such a condition is known as eosinophilia, or EOS, and indicates the possibility that the patient suffers from an allergic reaction. Accordingly, Dr. Daniel Bouwman of the OH clinic referred Shah to an allergist for further evaluation.
 
 
 3
 Between July 1990 and June 1992, Shah was evaluated a total of five times by three specialists. Shah continued to work in the chemical laboratory during this period. She alleges that during that time she developed symptoms of nausea, vomiting, dizziness, headaches, skin rash, fatigue, and difficulty with coordination, and that these symptoms "made living and working miserable." One of the specialists, Dr. Raymond Lord, a hematologist, determined from Shah's work records and medical history that her eosinophil count rose during periods that she worked in the chemical laboratory. Accordingly, he wrote Dr. Bouwman and recommended that Shah be transferred out of that laboratory. After a subsequent evaluation proved to be inconclusive, Upjohn assigned Shah to clerical work in July 1992. By the spring of 1993, Upjohn's need for clerical work diminished, and Gregory Szpunar, Shah's superior, asked Dr. Bouwman to release her to return to her prior position. Dr. Bouwman authorized that return. Szpunar wrote a letter to Shah on July 1, 1993, informing her that she had been assigned to the chemical laboratory and that her condition would be monitored over the course of her work.
 
 
 4
 Shah responded to the letter on the same day with an "Accommodation Request Form," pursuant to the Michigan Handicappers' Civil Rights Act (HCRA), Mich.Comp.Laws § 37.1101 et seq., requesting a non-laboratory assignment. She also submitted a note from Dr. Lord that recommended such an assignment and that noted that her health and her eosinophil count had improved since she stopped working in the lab. Later that day, Upjohn informed Shah that she should take leave, with pay, pending further instructions. Between July 1993 and February 1994, Shah unsuccessfully applied for a number of non-laboratory positions within Upjohn.
 
 
 5
 Dr. Evan Kokales, Upjohn's Director of Medical Services, arranged for Shah to be evaluated by Dr. Kenneth Rosenman of the Michigan State University College of Human Medicine. Dr. Rosenman examined Shah on November 2, 1993. He noted that, at that time, Shah was experiencing no physical difficulties, and that she had not worked in a laboratory for eighteen months. He noted that Shah's medical history was consistent with exposure to allergens at work, and that biological specimens were the most likely allergens. He concluded that Shah could return to work with chemical specimens, but that "she should stay away from biological specimens work."
 
 
 6
 Szpunar informed Shah that she was to report to work on January 18, 1994, to discuss a new assignment. Shah reported on that day to Dr. Kokales with another Accommodation Request Form and another note from Dr. Lord recommending a non-laboratory assignment. Dr. Kokales rejected Dr. Lord's recommendation, and subsequently stated in his affidavit that he accepted Dr. Rosenman's evaluation instead. Despite Dr. Rosenman's recommendation that Shah not be assigned to work with biological specimens, Dr. Kokales assigned Shah to the Biofluids Analytical Laboratory, and informed her that she would be provided with a ventilating hood and a respirator, and that her condition would be monitored. Shah objected to the assignment, arguing that it was contrary to Dr. Rosenman's recommendation. She claimed that the assignment was unacceptable also in that ten persons worked with biofluids in close proximity to each other, that the use of hoods without respirators would not prevent the inhalation of potential allergens, and that it was not realistic to expect a biochemist to submit to the discomfort of wearing a respirator on a long-term basis. Shah spent the rest of the day meeting with Szpunar and moving her belongings to the laboratory. Shah phoned Dr. Kokales and requested to meet with him again to discuss the assignment; however, Dr. Kokales refused to meet with her.
 
 
 7
 Shah reported to the biofluids lab the next day, January 19. She alleges that she was required to assemble laboratory equipment, an assignment for which she had no training and which she had never been required to perform before. She also alleges that her supervisor told her that Szpunar had ordered that she receive no assistance in the assembly of the equipment. Shah alleges that she began to feel ill by 10:00 a.m. She reported to the OH clinic shortly after noon, complaining of ear pain and headaches. No doctor was available at that time; however, a nurse examined her ear and found it to be normal. Shah then scheduled an appointment with a doctor for January 21 and, with the approval of her supervisor, Paul Bombardt, went home. Szpunar called her at home that night and informed her that she was expected to return to work the next day. Szpunar alleges that he told her that if she felt sick, she was to report to the OH clinic for evaluation, and that she would not be excused from work unless OH confirmed that she could not perform her duties. Szpunar also alleges that Shah told him that she understood his requirements. Shah, however, alleges that Szpunar did not provide her with the option of reporting to the OH clinic, but instead insisted that she report to the lab.
 
 
 8
 Shah did not report to the lab or to the OH clinic on January 20. Instead, she wrote a letter on that day to Dr. Kokales stating that she could not work in the lab but that she was willing to perform non-laboratory work. Szpunar called her and told her that she was suspended without pay and that she should remain at home until contacted by Upjohn.
 
 
 9
 Against Shah's wishes, her January 21 appointment with a doctor at the OH clinic was canceled. She tried to call Dr. Kokales later that day to ask him to reinstate the appointment; however, he did not return her call. Shah saw her family physician, Dr. James Van Hare, on January 24. She did not complain at that time of headaches, nausea, or other allergic symptoms. However, she did exhibit swollen and pale nasal mucosa, which may indicate an allergic reaction. Based on his review of Shah's medical history, Dr. Van Hare wrote to Dr. Kokales recommending a non-laboratory assignment.
 
 
 10
 Szpunar sent a letter to Shah on January 28, 1994, informing her that she was to report to the biofluids lab on February 1, and that if she felt too ill to report to work on that day or any day thereafter, she was to contact Bombardt and to report to the OH clinic for medical evaluation by 8:00 a.m. The letter informed her that if she failed to adhere to those conditions, her employment would be terminated. The letter also stated that "[p]ay for short term occasional absence will be discontinued after 120 hours."
 
 
 11
 At 7:30 a.m. on February 1, Shah delivered a letter to the OH clinic from Dr. Van Hare, which stated that she was under great stress and that she was scheduled to see a psychiatrist, and recommended again that she receive a non-laboratory assignment. Shah also delivered a letter addressed to Dr. Kokales, asking for a new assignment. She did not remain at the clinic for a medical examination as required by Szpunar's letter of January 28. Instead, she returned home and called Bombardt and Szpunar, informing them that she would not "ignore the advice of the doctors" and risk her health by complying with their directives.
 
 
 12
 Szpunar attempted to call Shah several times on February 2. He left a message on her answering machine requesting her attendance at a meeting at 8:00 a.m. the next day. Shah did not attend that meeting. Szpunar sent her a letter that day, February 3, informing her that Upjohn had terminated her employment as a result of her insubordination.
 
 II
 
 13
 Shah's complaint alleged that, by terminating her, Upjohn violated the ADA and the HCRA and committed the tort of intentional infliction of emotional distress. We discuss each claim in turn.
 
 A. Americans with Disabilities Act
 
 14
 Employers are prohibited under the ADA from discriminating against a person with a disability "because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This circuit has adopted the three-part burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), for the sequencing of proof in ADA claims. First, the plaintiff must establish a prima facie case of disability discrimination by putting forth evidence sufficient to support a finding that: (1) she is "disabled," as that term is defined in the ADA; (2) with or without reasonable accommodations, she was qualified for the position at issue in the suit; (3) she suffered an adverse employment decision with regard to that position; and (4) the position was filled by a non-disabled person. See Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 882 (6th Cir.1996). Second, if the plaintiff establishes a prima facie case, the burden shifts to the defendant to put forth evidence of a legitimate, nondiscriminatory reason for the adverse employment action. See id. at 883. Third, in order to avoid summary judgment, the plaintiff must then produce enough evidence to support a conclusion by the finder of fact that the defendant's proffered rationale is not the true explanation for its action. See id.; Manzer v. Diamond Shamrock Chems., 29 F.3d 1078, 1083 (6th Cir.1994).
 
 
 15
 We believe that summary judgment was proper on Shah's ADA claim because she failed to satisfy her burden of proof in the third part of the McDonnell Douglas analysis.[1] Upjohn produced affidavits and documentary evidence that demonstrated that it terminated Shah's employment for her repeated acts of insubordination: her failure to report to the lab or to submit herself for a medical evaluation at the OH clinic on January 20, 1994, which resulted in her suspension without pay; her failure to report to either location on February 1, in defiance of the instruction in Szpunar's January 28 letter that her appearance on that day was one of the "conditions of [her] employment"; and her failure to attend the February 3 meeting.
 
 
 16
 In response, Shah argues only that she believes that she complied with the requirements outlined in January 28 letter. She claims that the letter's statement that "[p]ay for short term, occasional absence will be discontinued after 120 hours" meant that she was entitled to take such leave on February 1. We do not believe that a reasonable fact-finder could accept Shah's interpretation of the letter. Szpunar set out several detailed instructions that Shah was expected to follow on February 1 and each day thereafter, including the requirement that she either report to the biofluids lab or submit to a medical evaluation at the OH clinic by 8:00 a.m. on that day. The letter's reference to paid leave cannot reasonably be read to permit Shah to take leave on February 1 without fulfilling those requirements. Shah's interpretation seems particularly strained to us in light of the fact that February 1 would have been her first day at work following a suspension without pay. Therefore, Shah has not proffered sufficient evidence of discriminatory motive to persuade a jury, and summary judgment was properly awarded to Upjohn on her ADA claim.
 
 B. Michigan Handicappers' Civil Rights Act
 
 17
 Shah also challenges her termination under the HCRA. However, as with the ADA claim, Shah's inability to rebut Upjohn's proffered rationale for her termination precludes her recovery under the HCRA. See Carden v. General Motors Corp., 401 N.W.2d 273, 276-77 (Mich.Ct.App.1987). Furthermore, while the HCRA requires employers to provide disabled employees with reasonable accommodations that are necessary for the performance of their jobs, it does not impose a duty on employers to place disabled employees in different positions if they are unable to perform the jobs for which they were hired. See Carr v. General Motors Corp., 389 N.W.2d 686, 690 (Mich.1986); Ashworth v. Jefferson Screw Prods., Inc., 440 N.W.2d 101, 104 (Mich.Ct.App.1989). Therefore, the denial of Shah's request to be assigned to a different position is not actionable under the HCRA.
 
 
 18
 C. Intentional Infliction of Emotional Distress
 
 
 19
 Finally, Shah argues that Upjohn's treatment of her was so outrageous as to constitute the tort of intentional infliction of emotional distress. The Michigan Supreme Court has not yet recognized the existence of that tort. See Roberts v. Auto-Owners Ins. Co., 374 N.W.2d 905, 908 (Mich.1985). We are reluctant to consider this claim, then, since we agree with the First Circuit that a federal court should "manifest[ ] great caution in blazing new state-law trails." Pearson v. John Hancock Life Ins. Co., 979 F.2d 254, 259 (1st Cir.1992). Even if we were to assume the existence of this tort under Michigan law, we believe that Upjohn's actions, as alleged by Shah, were not tortious, since they did not "go beyond all possible bounds of decency," Rush v. United Technologies, 930 F.2d 453, 456 (6th Cir.1991) (holding that termination of 35-year employee two months before pension benefits vested did not state claim under Michigan law), quoting Restatement (Second) of Torts § 46, comment d. Although Shah disagrees--perhaps with some justification--with Upjohn's ultimate interpretation of her medical condition, the record reveals that Upjohn referred her to numerous specialists in an effort to determine the cause of her symptoms, provided her with work outside the laboratory while such work was available, and gave her the option of reporting to the OH clinic if she felt ill. Therefore, the district court properly awarded summary judgment to Upjohn on Shah's intentional infliction of emotional distress claim.
 
 III
 
 20
 The judgment of the district court is AFFIRMED in No. 95-2337. The appeal in No. 96-1079 is DISMISSED as moot.
 
 
 
 [1]
 Our disposition renders it unnecessary for us to consider Upjohn's argument that Shah has failed to demonstrate a prima facie case of disability discrimination because the number of biochemical laboratory jobs that Shah may not have been able to perform was too small to constitute a "class of jobs," and therefore her inability to perform them would not constitute a "disability" under 29 C.F.R. § 1630.2(j)(3)(i). Accordingly, it is also unnecessary for us to consider Shah's request in appeal No. 96-1079 for the admission of her revised affidavit, which describes the category of jobs that she believes she is unable to perform