**Donn E. RUSH, Plaintiff–Appellant,**

v.

**UNITED TECHNOLOGIES, OTIS ELEVATOR DIVISION, Defendant–Appellee.**

**No. 90–1556.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 31, 1991.

Decided Feb. 22, 1991.

Scott F. Bergo (argued), Detroit, Mich., for plaintiff-appellant.

Richard J. Seryak (argued), Gillian Steinhauer, Miller, Canfield, Paddock & Stone, Detroit, Mich., for defendants-appellees.

Before MILBURN and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.

PER CURIAM.

This is an appeal from a summary judgment granted to the defendant in this wrongful discharge case. Plaintiff, Donn Rush, argues on appeal that there were genuinely disputed issues as to material facts and that summary judgment was therefore inappropriate.

Upon review, we conclude that summary judgment was appropriate and we affirm.

I.

Rush began working for Otis Elevator in 1951 in a sales capacity and continued with the company until his discharge in November of 1986. During this period of employment, Rush received a number of promotions and enjoyed good performance reviews until 1985. In 1985, however, Richard Caldwell became plaintiff's new supervisor, and his evaluation of Rush's work performance differed dramatically from Rush's preceding supervisor. The performance evaluation sheets used by the defendant required supervisors to rate employees in 13 different performance areas, *e.g.*, planning, decision making, and working with others. In 1984, on a scale ranging from "outstanding" to "unsatisfactory," Rush had received ten grades of "excellent" and three of "good." In 1985, with Caldwell doing the evaluating, Rush received five grades of "unsatisfactory," four of "satisfactory," and three of "good." A demotion accompanied this evaluation.

Rush had experienced problems for a number of years in connection with the handling of his expense account. As an outside salesperson, Rush was expected to entertain customers, but habitually filed late expense reports, which frequently lacked complete supporting documentations, as required. Although verbally chastised for this, no disciplinary action was ever taken. When Caldwell began reviewing the expense accounts, the official attitude changed. Caldwell, whose background was accounting and not sales, was obviously much more of a stickler for details.[1] The situation moved from benign disapproval, to which Rush was accustomed, to one in which every bean had to be counted. Caldwell sent Rush some rather harsh warning letters, making it clear that expense account peccadillos would no longer be tolerated.

Apart from late reporting, there were a number of procedural variances that could get one in trouble with an expense account.

1. It also appears that, at some time relevant to these events, Otis was taken over by United Technologies, and this resulted in stricter accounting practices for expense accounts.

For example, there was overspending the monthly amount allocated, using a disproportionate amount of the entertainment allowances for bar bills, billing for expenses not business related,[2] and reporting more than actually was spent. Although Rush at one time or another appears to have committed all of these expense account sins, it was the "doctoring" of receipts to reflect more than was spent that proved his ultimate downfall.

An investigation and audit was conducted by management. On November 13, 1986, Rush was confronted with three receipts he had submitted and the actual restaurant records showing the actual amount spent, which was less than what the receipts showed. When Rush was unable to explain the discrepancies, he was given the choice of resigning or being terminated. Rush declined to resign and was fired.

Although terminated, Rush still remained eligible to receive the pension he earned during his 35–year tenure with Otis. He might have left it at that were it not for the fact that, three weeks after his termination, Otis announced a substantial improvement in its pension plan insofar as "early retirements" were concerned. Had Rush been on the payroll on January 10, 1987, he could have benefited from this plan change if he had elected to take early retirement.

In December 1987, Rush filed this action alleging wrongful discharge, negligent performance evaluation, promissory estoppel, intentional infliction of emotional distress, age discrimination, and a violation of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* Since we are considering an appeal from a summary judgment, we review each of plaintiff's claims *de novo. Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987).

## II.

Relying on the *Toussaint* doctrine,[3] Rush claims he is not an at-will employee and could only be fired for just cause. Although we have serious reservations as to whether Rush could bring himself within the protection of the *Toussaint* ruling, we find it unnecessary to discuss this issue since we conclude that Rush was fired for just cause. The falsification of expense account records is a serious breach of responsibility on the part of an employee and constitutes just cause for termination. Although Otis had tolerated a certain laxity on the part of Rush over the years, it was clear that management's attitude had changed, and Rush was adequately informed of the new outlook both verbally and in writing. Our conclusion on this issue also disposes of the promissory estoppel argument. The fact that the company arguably had condoned Rush's deviation from the norm does not bind them forever to this policy. It was made abundantly clear to Rush that his past practices were no longer to be tolerated.

## III.

We find no merit to plaintiff's claim for the tort of negligent evaluation of his expense account practices.

The law in Michigan is well-settled that an action in tort requires a breach of duty separate and distinct from a breach of contract. *Haas v. Montgomery Ward & Co.,* 812 F.2d 1015 (6th Cir.1987); *Kewin v. Massachusetts Mutual Life Insurance Co.,* 409 Mich. 401, 295 N.W.2d 50 (1980); *Hart v. Ludwig,* 347 Mich. 559, 79 N.W.2d 895 (1957); *Brewster v. Martin Marietta Aluminum Sales, Inc.,* 145 Mich.App. 641, 378 N.W.2d 558 (1985). In *Hart,* Michigan's highest court noted the distinction between the legal duty which arises by operation of a contract and the fundamental concept of a legal duty to avoid conduct which creates liability in tort. "[I]f a relation exists which would give rise to a legal duty

---

**2.** Rush was filing what was referred to as "generic" receipts. These were restaurant or bar stubs with an amount but with no indication of what business purpose was served by the expenditure.

**3.** *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980).

without enforcing the contract promise itself, the tort action will lie, otherwise not." *Hart,* 347 Mich. at 565, 79 N.W.2d at 898 (quoting W. Prosser, *Handbook of Torts,* § 33 at 205 (1st ed. 1941)).

. . . .

Plaintiffs rely on *Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 302 N.W.2d 307 (1981), and *Chamberlain v. Bissell, Inc.,* 547 F.Supp. 1067 (W.D. Mich.1982), to argue that negligent performance of a contract constitutes a tort. This reliance is seriously misplaced. While *Schipani* points out that a breach of contract may also be a tort, it does not address the salient feature of *Haas, Hart,* and *Brewster:* an action in tort will not arise for a breach of contract unless the action in tort would arise independent of the existence of the contract. In its discussion of tort liability, plaintiffs' own authority, *Chamberlain,* states, *"There must be some breach of duty distinct from breach of contract." Chamberlain,* 547 F.Supp. at 1081 (quoting *Hart v. Ludwig,* 347 Mich. at 563, 79 N.W.2d 895) (citation omitted) (emphasis in original). Plaintiffs' claim in tort cannot exist under Michigan law because plaintiffs do not claim that the defendant has caused any harm in the realm beyond the contract.

*Brock v. Consolidated Biomedical Laboratories,* 817 F.2d 24, 25 (6th Cir.1987).

Apart from not recognizing plaintiff's theory of action for negligent evaluation, we also note that our conclusion that Rush was terminated for just cause would really subsume the issue of any alleged negligence in evaluating his expense accounts.

### IV.

■ Since the Michigan Supreme Court has yet to recognize the tort of intentional infliction of emotional distress, the issue of its viability in this Michigan diversity case is less than clear. The panels of the Michigan Court of Appeals that have recognized this tort have adopted the elements of intentional infliction of emotional distress, as articulated in section 46 of the Restatement (Second) of Torts:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Cebulski v. Belleville,* 156 Mich.App. 190, 194, 401 N.W.2d 616 (1986); *Ledl v. Quik Pik Food Stores, Inc.,* 133 Mich.App. 583, 349 N.W.2d 529 (1984).

In commenting on a claim of intentional infliction of emotional distress, we stated in *Polk v. Yellow Freight System, Inc.,* 801 F.2d 190, 195–96 (6th Cir.1986):

The Restatement defines this tort narrowly:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id.* at § 46, comment d, *quoted in Warren* [*v. June's Mobile Home Village & Sales,*] 66 Mich.App. [386] at 390–91, 239 N.W.2d 380 [ (1976) ]. The defendant is not liable for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," Restatement (2d) of Torts § 46, comment d (1965), *quoted in Warren,* 66 Mich.App. at 391, 239 N.W.2d 380, nor is the defendant liable "where he has done no more than to insist upon his legal rights in a permissible way, even though he was well aware that such insistence is certain to cause emotional distress." Restatement (2d) of Torts § 46, comment g (1965).

Without attempting to define the contours of this tort, if recognized in an employment setting, suffice it to say that plaintiff has alleged no action on the part of the defendant here that would equate

with the type of outrageousness contemplated by the Restatement.

## V.

■ To support his claim of age discrimination,[4] Rush has come forward with little except that he was 54 years of age at the time of his discharge.[5] No one was hired to replace Rush. His duties were taken over by another person already in the employ of Otis. Even if we were to assume that Rush made out a prima facie case of age discrimination, Otis offered a non-discriminatory explanation for the firing and Rush has not demonstrated the ability to prove that reason was pretextual. *Simpson v. Midland–Ross Corp.*, 823 F.2d 937 (6th Cir.1987).

## VI.

■ Plaintiff's ERISA claim, added by amendment after the case was removed to federal court, is predicated upon the claim that his discharge was motivated by the desire to keep him from being eligible for the expanded early retirement benefits, which became effective after his discharge. In commenting on a similar claim, the Fifth Circuit stated:

> Clark's main contention is that Resistoflex will realize certain economies by not having to pay him the larger pension he would receive upon retirement at a later date....
>
> ....
>
> Here, it is undisputed that no benefits previously earned by Clark will be for-

feited by reason of his discharge. Thus, regardless of whether the discharge was arbitrary, its impact upon retirement benefits was only incidental—the resulting loss was simply that which would result from any discharge. It follows, then, that where the only evidence that an employer specifically intended to violate ERISA is the employee's lost opportunity to accrue additional benefits, the employee has not put forth evidence sufficient to separate that intent from the myriad of other possible reasons for which an employer might have discharged him.

*Clark v. Resistoflex Co.*, 854 F.2d 762, 771 (5th Cir.1988) (footnote omitted).

In addition, Rush presented no evidence that anyone at Otis had any knowledge of the January 1, 1987, amendment to the Otis Pension Plan prior to Rush's discharge seven weeks before the amendment. Rush likewise presented no probative evidence that Otis had any intent, much less specific intent, to deprive him of the option to take early retirement. Not only is there no evidence that Rush ever told anyone from Otis that he intended to retire early, but also Rush testified in deposition that he might not have retired early in 1987, even if he had been given the option. In order to prevail on an ERISA claim of this nature, a plaintiff must show that an employer had a specific intent to violate ERISA. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988).

Rush's just cause firing, which he could not show to be pretextual, would also ne-

---

**4.** Plaintiff's age discrimination claim was brought pursuant to the provisions of Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp.Laws Ann. § 37.2101 *et seq.*

**5.** At his deposition, Rush testified as follows on his age discrimination claim:

Q. Who at Otis are you claiming discriminated against you on the basis of age?

....

A. Well, I think that you know, since I would have had—you know, I would have been age 55 on May 27th of '87, and since all of the information that was coming out a week or two after I was fired indicated that anybody on the payroll as of January 1, 1988 would obtain the benefits, a substantial benefit improvement in retirement and in other

areas, that one of the reasons to discharge me was for the reason that they were trying to save money by getting rid of me. I mean I was 'over the hill' so to speak for their purpose.... I can't tell you who it was. It could have been the corporation. Who knows?

....

Q. Are you saying, Mr. Rush, that you do not have any opinion as to who might have discriminated against you on the basis of age?

A. I wouldn't charge anybody on that specifically, no.

Q. Other than what you have just testified to, do you have any other basis for your age discrimination claim?

A. Nope.

gate the specific intent required to show an ERISA violation.

We can well understand the disappointment, shock, and disbelief that Rush felt upon being terminated after 35 years of what appears to be loyal service to his employer. In upholding the discharge against legal challenge, we pass on neither its wisdom nor its humanity. In discharge cases, unless a clear legal violation is shown, it is not appropriate for us to second guess the business judgment of employers in personnel matters.[6]

AFFIRMED.

**6.** Since we decide this appeal in favor of the defendant, we find it unnecessary to discuss its contention that ERISA preempts plaintiff's other state causes of action. Since this case was briefed, the Supreme Court has issued its opinion in *Ingersoll–Rand Co. v. McLendon,* — U.S. ——, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), which broadly construes section 514(a), the preemption provision, of ERISA. 29 U.S.C.

§ 1144(a). As we view plaintiff's complaint, however, at least some of the wrongs alleged do not relate to a theory that his discharge was motivated by a desire to avoid paying him increased pension benefits. Plaintiff, in effect, has pleaded alternative theories of recovery. Since we find for the defendant, we are spared the detailed analysis required to determine each claim if they were each preempted.