RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0053p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

HALEY HRDLICKA,

                    *Plaintiff-Appellant*,

    *v.*

GENERAL MOTORS, LLC,

                    *Defendant-Appellee*.

No. 22-1328

Appeal from the United States District Court for the Eastern District of Michigan at Port Huron.
No. 3:20-cv-11015—Robert H. Cleland, District Judge.

Argued: December 7, 2022

Decided and Filed: March 23, 2023

Before: SILER, GILMAN, and NALBANDIAN, Circuit Judges.
_____

## COUNSEL

**ARGUED:** Ray Carey, GASIOREK, MORGAN, GRECO, MCCAULEY & KOTZIAN, P.C., Farmington Hills, Michigan, for Appellant. Daniel G. Cohen, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PLLC, Birmingham, Michigan, for Appellee. **ON BRIEF:** Ray Carey, GASIOREK, MORGAN, GRECO, MCCAULEY & KOTZIAN, P.C., Farmington Hills, Michigan, for Appellant. Daniel G. Cohen, Mami Kato, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PLLC, Birmingham, Michigan, for Appellee.
_____

## AMENDED OPINION
_____

RONALD LEE GILMAN, Circuit Judge. Haley Hrdlicka was employed by General Motors for over 30 years. After General Motors terminated her employment due to excessive absenteeism, she brought this employment-discrimination lawsuit. The district court granted

summary judgment in favor of General Motors on all claims.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.      Hrdlicka's employment at General Motors

Hrdlicka, a white female, began working for General Motors in March 1989.  She was 53 years old when terminated.  Hrdlicka began her career as an associate sculptor in General Motors's Sculpting Department, where she hand-sculpted vehicle models using clay.  She held this position until 1998, when she took about eight months off to have her first child.  When Hrdlicka returned to work, she remained in the Sculpting Department, but her responsibilities shifted to operating a mill for clay sculpting and training others on the machinery.  In 2001, she took approximately three years off for "extended leave," which included maternity leave for her second child, sick days to care for her family, and a leave of absence.

When Hrdlicka returned to the Sculpting Department in 2004, her job duties again shifted.  She began coordinating training and developing best practices for clay sculptors.  By 2007, Hrdlicka had completely moved away from sculpting and milling.  She transitioned to outreach activities in 2012 and then later to recruiting efforts by 2017.

### B.      General Motors transferred Hrdlicka from its Sculpting Department to its new Design Academy

Hrdlicka's days in the Sculpting Department came to an end in 2017, when General Motors created a new department called the Design Academy.  The Design Academy centralized recruitment, outreach, and training functions for all design operations.  In May 2017, Hrdlicka was informed that she would be transferred to the Design Academy.  She reluctantly accepted the transfer.

The Design Academy consisted of six employees, including Hrdlicka.  The previous Sculpting Manager, Marguerite Eko, was assigned to lead the new department.  Unlike her time in the Sculpting Department, Hrdlicka was not fond of the Design Academy, expressing distaste with "the environment and leadership and hostility and the whole dynamic of the team."

Hrdlicka had not worked directly under Eko in the Sculpting Department, but with Eko now her immediate supervisor, the relationship became strained. Conflicts soon arose between Hrdlicka, Eko, and another employee in the Design Academy named Kathy Englehart. Hrdlicka alleged that Eko showed favoritism to Englehart and that Englehart was "demeaning and hostile." As tensions rose, Hrdlicka told Eko during a meeting in late 2018: "I do not trust [Englehart], and frankly, I do not trust you, and I do not enjoy my job anymore at all."

In addition to her disdain for her new work environment, Hrdlicka was dissatisfied with the substance of her new role. Hrdlicka thought that the Design Academy was "in chaos from the start because it had to quickly launch the summer intern program, and she was required to learn her new job duties and responsibilities 'by fire.'"

**C.      Unhappy with the Design Academy, Hrdlicka requested a transfer back to the Sculpting Department**

The new work environment and her dislike of Eko and Englehart prompted Hrdlicka to seek a change. In August 2017, Hrdlicka asked Eko to be transferred back to the Sculpting Department. Hrdlicka wanted to return to her old department where she "got along with her bosses and co-workers," and she felt "so extremely happy and respected." According to Hrdlicka, her request was "open-ended," and she hoped to transfer back to "any role for which she was qualified in the Spring or Fall [of] 2018" because that was her "career path."

Eko informed Mark Leavy, Eko's supervisor, of Hrdlicka's transfer request, but Leavy stated that Hrdlicka could not return to the Sculpting Department because her former position had been eliminated. In addition, Hrdlicka could not leave the Design Academy unless her current position could be backfilled. The Sculpting Department, for its part, had room only for a new sculptor and, as Hrdlicka conceded, she had not done hands-on sculpting for a "very, very long time." Hrdlicka maintains, however, that she was told multiple times by a manager in the Sculpting Department that the manager would support her transfer request. She also argues that Eko failed to adequately communicate to Leavy that Hrdlicka was willing to accept any position for which she was qualified.

**D.    Hrdlicka began regularly missing work and arriving late, resulting in Hrdlicka missing crucial work related to her responsibilities for the summer-intern program**

Beginning in May 2019, Hrdlicka began regularly missing work or arriving late. Unbeknownst to both Hrdlicka and General Motors, Hrdlicka was suffering at the time from a brain tumor and a condition known as Persistent Depressive Disorder, neither of which were diagnosed until well after she was discharged. Hrdlicka now attributes her attendance issues to the "increasingly more severe physical and behavioral health related symptoms of the brain tumor and Persistent Depressive Disorder." She used sick days, vacation days, or worked remotely as needed, informing Eko "as soon as she was able to do so."

The reasons that Hrdlicka gave Eko for why she would be absent or tardy, however, were often not related to her own health and sometimes did not contain any explanation. The communications between Eko and Hrdlicka included:

- **May 7, 2019, 8:20 AM** – Hrdlicka: "I am not coming in today. My head is really hurting. I will come get my laptop in a bit. Thank you."

- **May 8, 2019, 8:24 AM** – Hrdlicka called Eko and indicated that she was still not feeling well and asked a friend to pick up her computer.

- **May 17, 2019, 8:07 AM** – Hrdlicka: "Hi Maggie. I am taking a vacation day today. [My daughter] Ashley had a high temperature and a bad cough so I am taking her to the doctors . . . ."

- **May 24, 2019, 8:27 AM** – Hrdlicka: "Hello, A family situation has come up. I will call you in a few. I will have to take a vacation day to deal with it. Thank you."

- **May 31, 2019, 8:25 AM** – Hrdlicka: "Hello Maggie. Would it be possible for you to run my laptop out to me at the south lobby at 9? If it is ok with you I would like to work from home today."

- **June 6, 2019, 8:35 AM** – Hrdlicka: "Hi Maggie, I am running late this morning. I'll be in short[l]y."—Hrdlicka arrived at nearly 12 p.m. after Eko responded "are you ok? I'm getting worried about you."

- **June 7, 2019, 8:50 AM** – Hrdlicka: "I am trying to see if I can get into the dr today. I am just so tired. I am going to work from home if that is ok. Hopefully something is off that a blood test can solve . . . iron or something."

- **June 11, 2019, 8:36 AM** – Hrdlicka informed Eko that she was running late.

- **June 12, 2019, 7:37 AM** – Hrdlicka: "Hello Maggie. . . . I am taking a vacation day today. Thank you."

- **June 18, 2019, 8:08 AM** – Hrdlicka: "I will be late this morning. One of [my daughter] Ashley's friends stayed the night last night and long story short I need to stay here until her mom comes to get her. I'll explain later." She arrived around 11:00 AM.

- **June 25, 2019, 8:21 AM** – Hrdlicka: "Good morning . . . . I'm at the doctors with [my daughter] Ashley. She is getting a breathing treatment and then I will be in."

- **July 16, 2019, 9:20 AM** – Hrdlicka informed Eko that she had a flat tire and would work from home. She appeared online for a meeting that morning, but "lost contact" and was not seen working online again after 1:30 p.m.

- **July 24, 2019, 9:03 AM** – Hrdlicka: "Hello Maggie . . . . I am home today. I have a fever and other symptoms. I will call in for your intern planning meeting."

- **July 26, 2019, 9:04 AM** – Hrdlicka: "I'm coming in. I am just having a tough time this morning. Please do not share that with anyone please . . . ."

- **July 31, 2019, 9:30 AM** – Hrdlicka: "I will not make your 10 meeting. I am not feeling well . . . . But I will be online later. I'm in bed."

- **August 2, 2019, 9:58 AM** – Hrdlicka: "Hello. I have been with my dad this morning. He was having some issues. I will be in shortly."

- **August 7, 2019, 9:28 AM** – Hrdlicka: "Hi. I am getting [my daughter] Ashley's hands wrapped before she goes to nannying."

- **August 8, 2019, 10:32 AM** – Hrdlicka: "Hi Maggie . . . . I'm struggling this morning and [I] am [not] sure if I make it in . . . . It's more of a mental thing . . . please do not share . . . . Thank you. The certificates are on my desk. Black folders."

- **August 9, 2019, 10:13 AM** – Hrdlicka: "Hi . . . . I will not be in today."

- **August 13, 2019, 12:06 PM** – Hrdlicka: "Hello Maggie I will not be in today. I'm out sick and will review items from home. Thank you."

By June 2019, Hrdlicka was persistently late in arriving for work. Eko expressed concern to Hrdlicka about her attendance during a one-on-one meeting on June 10, 2019. During the

meeting, Eko "communicated the need to work a 40 [hour] work week," "the need to text if she was planning on taking a day off," and the "need to get 'work from home' approved in advance."

Eko appears to have never denied or questioned any of Hrdlicka's time-off requests, nor did she inquire into the legitimacy of Hrdlicka's stated reasons for missing work. Further, although Hrdlicka mentioned trying to see a doctor in her June 7, 2019 text message, she admits that she never actually saw a doctor, nor was she ever treated for any of the ailments that she reported in her messages.

In July 2019, with the assistance of Christie Spadine, a human-resources representative, Eko conducted Hrdlicka's mid-year performance review. The review indicates that Hrdlicka was on track to achieve all but one of her year-end goals. It also acknowledges that the team had "faced several challenges and changes this year" due to "the unplanned loss of a team member," and that Hrdlicka's responsibilities had changed mid-year. Eko notes, however, that Hrdlicka was "[not] completing her . . . role" and that a "significant and contributing factor to [Hrdlicka's] decreased performance has been her attendance. [Hrdlicka] has had a challenging last 6 months [and] she had to take several unplanned days off." The review further states that Hrdlicka should "plan vacation in advance and seek approval prior to taking a vacation day," and that the "expectation is for [Hrdlicka] to put in a full work week—with a minimum of 40 hours per week."

Hrdlicka's attendance problems did not abate. She continued to miss work and call in late during August 2019. In particular, Hrdlicka missed several "critical" days in early August related to General Motors's summer-intern program, over which she had chief responsibility. The summer interns made formal presentations during the second week of August that "impacted whether they would receive a job offer from GM." On August 7, the day of the presentation dry-runs, Hrdlicka did not arrive until after 1:00 p.m. Although Hrdlicka now claims that the reason for her late arrival was due to her own deteriorating physical and behavioral health, she did not inform Eko of this at the time and in fact texted Eko that she was late due to a medical issue involving her daughter's hand.

The final intern presentations were conducted the following day, and Hrdlicka missed them entirely.  And the day after that, on the interns' last day, Hrdlicka once again missed work.  She did not inform her team that she would be gone until after 10:00 a.m. on both days.  Hrdlicka's reason for missing the presentations was that she was dealing with a "mental thing."  She provided no reason for missing the interns' last day.

**E.      General Motors terminated Hrdlicka after she violates the terms in her Attendance Letter**

Following the wave of attendance issues during the summer interns' final week, Eko reached out to Spadine in human resources for "HR Support."  Eko wrote that Hrdlicka had "arrived late 10:30 and beyond almost every day after her [mid-year performance review] . . . .  HELP!  We need to work on next steps."

The following week, on August 14, 2019, Hrdlicka met with Eko and Anne Banks, a second human-resources employee, and was given an Attendance Letter.  The letter specially noted Hrdlicka's "erratic work schedule[]" and that it "create[s] a disruption to the team."  Further, the letter stated that Hrdlicka was expected to work from 8:00 a.m. to 4:30 p.m. every day and that she must notify Eko "as soon as practicable" if she needed to deviate from this schedule, and by 7:00 a.m. should she need to be absent that day.  It also provided that absences due to personal illnesses required a doctor's note, but that these requirements were not applicable "when an appropriate health care provider certifies your eligibility for S&A [Sickness and Accident] benefits or provides satisfactory certification of need for a qualifying unpaid Family and Medical Act leave."  In addition, the letter noted that Hrdlicka should receive pre-approval before working from home.

The Attendance Letter was also clear about the consequences of continued attendance issues, and it alerted Hrdlicka that she could contact HR for a possible accommodation if needed.  Specifically, the letter states:

> We want to draw your attention to the seriousness of the current situation and the necessary steps required to improve your attendance.  Your attendance must improve immediately.  Your job is in jeopardy.  We expect that you will take all necessary steps to remedy the situation.  Failure to comply with these expectations can result in disciplinary action, up to and including discharge from

General Motors.  Please contact Human Resources if you believe you may require an accommodation to help you perform your job duties.

Hrdlicka signed the Attendance Letter, which was also read to her during the meeting and sent to her by email.  In addition to the explicit reference to S&A services and FMLA leave in the letter, Eko's email to Hrdlicka included a standard note about General Motors's "People Services Program," which can be used for assistance with "general policy questions."  Banks further recalls mentioning to Hrdlicka during the August 14, 2019 meeting that the Employee Assistance Program (EAP) was available should she need it, although Hrdlicka could remember only that Banks "may have" mentioned the program, and, in any event, she did not know what it was.

Hrdlicka did not inquire into the S&A or sick-leave benefits, the People Services Program, or the EAP, which she attributes to her "state of shock" upon being presented with the Attendance Letter.  She also did not take advantage of General Motors's *Socrates* portal, which provides information about the confidential EAP, leaves of absences, and other accommodations.

Despite the Attendance Letter, Hrdlicka was 5 minutes and 32 minutes late on the very next two days that she worked, respectively.  She reported neither delay to Eko, although she later explained that, on the day that she was 32 minutes late, she was on the phone with her father and did not want to end the call.  That same day, on August 19, Hrdlicka met with Banks and Spadine, mentioning to them for the first time that she was unhappy in the Design Academy and with Eko's lack of leadership.  Hrdlicka also renewed her request to transfer to the Sculpting Department, which she admits was the only "accommodation" that she sought at the time.

The parties dispute whether Hrdlicka mentioned to Banks and Spadine during the August 19, 2019 meeting that she was depressed.  According to Hrdlicka, she advised Banks and Spadine that she "had been experiencing severe depression since [her] transfer to the Design Academy . . . [and] this had caused [her] to request a transfer back to Sculpting and to be absent from work . . . and to arrive later than usual."  Hrdlicka argues on appeal that the depression that she experienced since transferring to the Design Academy "precipitated her request for a transfer back to Sculpting."  But Banks and Spadine deny that Hrdlicka ever mentioned that she was depressed or suffered from any medical condition.  According to Hrdlicka, she was interrupted

by Banks and Spadine when she brought up her depression and was told that "they were only concerned about why she had been late arriving for work" for the past two business days. Hrdlicka also stated in her deposition and in her open-door appeal that, during the meeting, she explained to Banks and Spadine that "the reasons for [her] recent tardiness [were] related to [her] current work environment created by [Eko]."

The very next day, and for the third workday in a row, Hrdlicka was late due to traffic. Eko then made the decision to terminate Hrdlicka and did so the following day, on August 21, due to her repeated violations of the Attendance Letter immediately after it was issued.

**F.　　Hrdlicka appeals her termination and is diagnosed with Persistent Depressive Disorder and a brain tumor while the appeal is pending**

General Motors has an "Open Door Policy" that provides all salaried employees with the opportunity to appeal their termination through JustUs, a third-party company. JustUs is charged with determining whether General Motors "followed their policies and practices" in terminating an employee. The review is limited to the "facts [as] of the day that the decision is made and the action is taken."

Hrdlicka filed her appeal with JustUs in late August 2019, stating that, prior to her termination, she "notified HR of [her] depression," which she "perceive[d] to be directly related to the work environment created by [Eko]." While the appeal was pending, in October 2019, Hrdlicka was diagnosed with Persistent Depressive Disorder. In November 2019, also before the appeal was decided, Hrdlicka was diagnosed with a brain tumor that was surgically removed a few days after diagnosis.

Hrdlicka asserts, through her own affidavit and summary-judgment brief, that her doctor "opined that the brain tumor was the cause or contributing cause of the severe depression diagnosed . . . as Persistent Depressive Disorder that [Hrdlicka] had experienced during at least the last 18 months of her General Motors employment." The affidavit also claims that these symptoms affected Hrdlicka's "ability to care for herself, perform manual tasks, eat, sleep, concentrate, think and make decisions, communicate, interact with others, and work." She did not, however, file an affidavit from her doctor.

Soon after Hrdlicka's brain-tumor diagnosis, her husband forwarded an email to the JustUs personnel, informing them of the brain tumor. Her husband again emailed JustUs personnel after Hrdlicka's surgery. Mr. Hrdlicka's emails attributed Hrdlicka's tumor, at least in part, to the stress and work environment of the Design Academy.

As part of its investigation, JustUs interviewed Hrdlicka, Eko, Banks, and Spadine. It did not, however, attempt to interview Hrdlicka's doctor, even after learning of her diagnosis. But no one at General Motors, not even Hrdlicka herself, was aware of the existence of a brain tumor on August 21, 2019 when she was terminated.

JustUs ultimately denied Hrdlicka's appeal in late November 2019. The decision letter cites Hrdlicka's continued attendance issues despite being made aware of the issue in her mid-year review and in the Attendance Letter given to her just before her termination. It further states that Hrdlicka's termination was consistent with General Motors's policies and that there was a lack of suitable "evidence to substantiate [her] allegations of depression" at the time of her termination.

Following the conclusion of her open-door appeal, Hrdlicka filed suit against General Motors, alleging the following claims: (1) disability discrimination and failure to accommodate under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq.* and Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws §§ 37.1101, *et seq.*; (2) violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601, *et seq.*; (3) violation of Section 510 of the Employment Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001, *et seq.*; (4) age discrimination, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621, *et seq.* and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws §§ 37.2101, *et seq.*; (5) sex discrimination, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e, *et seq.* and the ELCRA; and (6) race discrimination, in violation of Title VII and the ELCRA. General Motors later moved for Summary Judgment, which the district court granted as to all claims. This timely appeal followed.

## II. ANALYSIS

### A.    Standard of review

We review a district court's grant of summary judgment de novo.  *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016) (citation omitted).  Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the burden of demonstrating that there is no genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In making this assessment, the court must "view all evidence in the light most favorable to the nonmoving party."  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016) (citation omitted).

### B.    ADA claims and PWDCRA claims

Hrdlicka argues that her ADA and PWDCRA claims should have survived summary judgment because there is a genuine dispute of material fact as to whether General Motors (1) discriminated against Hrdlicka on account of a disability, and (2) failed to accommodate her disability.  The PWDCRA "substantially mirrors" the ADA, and a resolution of the ADA claims will "generally, though not always, resolve the plaintiff's PWDCRA claim."  *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012)).  Claims under the ADA and the PWDCRA are "generally analyzed identically."  *Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 497 (6th Cir. 2015) (quoting *Steward v. New Chrysler*, 415 F. App'x 632, 641 (6th Cir. 2011)).

### a. *Disability discrimination*

Hrdlicka advances her theory of disability discrimination via circumstantial evidence. Courts use the *McDonnell Douglas* burden-shifting framework when a plaintiff uses circumstantial evidence to establish disability discrimination under the ADA and the PWDCRA. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).  To establish a prima facie case, an employee must demonstrate that (1) she has a disability, (2) she is otherwise qualified for the job "with or without reasonable accommodation," (3) she "suffered an adverse employment decision," (4) her employer "knew or had reason to know" of her disability, and (5) her position remained open, or she was replaced.  *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)).

If the employee establishes a prima facie case, the burden shifts to the employer to "demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (citing *Whitfield*, 639 F.3d at 259).  The burden then shifts back to the employee to show that the purported nondiscriminatory reason "was actually a pretext designed to mask discrimination." *Id.* (citing *Whitfield*, 639 F.3d at 259).

### i. *Hrdlicka failed to establish a prima facie case of discrimination*

We agree with the district court's conclusion that Hrdlicka failed to establish a prima facie case of disability discrimination under either the ADA or the PWDCRA because her purported disability was unknown to either herself or General Motors until well after her employment was terminated.  The parties agree that Hrdlicka was never diagnosed with any medical condition until after her termination.  In fact, she never even sought medical help for any symptoms or conditions from which she was suffering while employed.  Hrdlicka nevertheless maintains that General Motors was on notice that she was disabled (1) because of several text messages that Hrdlicka sent to Eko when Hrdlicka failed to show up for work and, (2) because she mentioned that she was depressed in a meeting with Banks and Spadine shortly before she was terminated.  We address both of these arguments in turn.

The text-message communications between Eko and Hrdlicka were not enough to place Eko on notice that Hrdlicka was suffering from a disability.  Although an employee is not required to use the word "disabled" to put his or her employer on notice, the employer still must "know enough information about the employee's condition to conclude that he is disabled. Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." *Cady v. Remington Arms Co.*, 665 F. App'x 413, 417–18 (6th Cir. 2016) (internal citation omitted) (noting that there is not likely sufficient notice "[i]f the sole evidence of notice [is] a vague assertion of concern").  "The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (quoting *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046–47 (6th Cir. 1998)).

Hrdlicka's text messages required Eko to speculate as to the existence of a disability. Many of the text messages reference only generalized ailments, such as Hrdlicka's "head . . . really hurting," having a "fever and other symptoms," or simply being "sick."  Such symptoms are consistent with many short-term, nondisabling ailments, including a common cold.  Other text messages make even more general references to "having a tough time" or dealing with "a mental thing."  Although these messages might have given Eko a general awareness of a health issue, that is not enough. *See Messenheimer v. Coastal Pet Prods., Inc.*, 764 F. App'x 517, 519 (6th Cir. 2019) ("[A] general awareness of some symptoms is not enough to show that [the defendant] knew of [the plaintiff's] disability." (citation omitted)).  At bottom, these text messages were not sufficient to apprise Eko of a disability, especially when Hrdlicka herself was unaware of any disability.

The closer question is whether Hrdlicka put General Motors on notice of a disability when she met with Banks and Spadine shortly before she was terminated.  In that meeting, Hrdlicka told them that she had felt depressed since transitioning to the Design Academy.  In explaining her tardiness, however, Hrdlicka stated that "it was all related to [her] current work environment created by [Eko,] . . . includ[ing] a lack of leadership, direction, a lack of trust within the group, favoritism," etc. *See Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1062 (7th

Cir. 2000) ("Standing alone, a personality conflict between an employee and a supervisor—even one that triggers the employee's depression—is not enough to establish that the employee is disabled, so long as the employee could still perform the job under a different supervisor."); *Burdett-Foster v. Blue Cross Blue Shield of Michigan*, 574 F. App'x 672, 680 (6th Cir. 2014) ("Personality conflicts, workplace stress, and being unable to work with a particular person or persons do not rise to the level of a 'disability' or inability to work for purposes of the ADA." (quoting *Fricke v. E.I Dupont Co.*, 219 F. App'x 384, 389 (6th Cir. 2007)). Hrdlicka's attribution of her depression to her work environment persisted even in her open-door appeal of her termination, where she said that, when she "notified HR of [her] depression," she "perceive[d] [it] to be directly related to the work environment."

In sum, Hrdlicka made only a single, unsubstantiated statement that she was depressed without any corroborating medical evidence and without ever having sought medical help, and she consistently presented the issue as a workplace conflict, not a disability. Although a diagnosis is not necessary for an ADA claim to succeed, *see Neely v. Benchmark Fam. Servs.*, 640 F. App'x 429, 435 (6th Cir. 2016), Hrdlicka failed to present any of the "[r]elevant information" that this court has found pertinent to determining if an employer was placed on notice of a disability. *See Cady*, 665 F. App'x at 417.

The mention of depression alone is insufficient to constitute a "severe symptom" for two reasons. First, depression does not always render an employee "disabled." *See Huge v. Gen. Motors Corp.*, 62 F. App'x 77, 79–80 (6th Cir. 2003) ("The fact that a person has a history of depression does not necessarily mean that the person has a disability under the ADA." (citing *Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996), for the proposition that "[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA.")). Second, Hrdlicka consistently and specifically attributed both her attendance issues and depression to a dislike of Eko and the work environment, leaving General Motors to "speculate" as to the existence of a disability as opposed to Hrdlicka's concern about her interpersonal work conflict. *See Hammon*, 165 F.3d at 450 (quoting *Gantt*, 143 F.3d at 1046); *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) ("A prima facie case is not made out if the decisionmaker is unaware of the specifics

of an employee's disabilities or restrictions, even if the decisionmaker has a general knowledge that a disability exists." (citing *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015))).

### ii. General Motors had a legitimate, nondiscriminatory reason for terminating Hrdlicka

Even if Hrdlicka were deemed to have made out a prima facie case, General Motors presented a legitimate, nondiscriminatory reason for terminating her. The record is clear that Eko terminated Hrdlicka because of multiple failures to arrive to work on time and for multiple absences without adequate notice, including absences during a critical week for her job. Eko informed Hrdlicka of Eko's concerns about Hrdlicka's attendance during both a one-on-one meeting in June 2019 and in Hrdlicka's mid-year performance review in July 2019. The performance review noted that Hrdlicka's performance had declined and that a "significant and contributing factor" was her attendance. Despite this, Hrdlicka continued to arrive late and miss important work, including the summer interns' final presentations over which Hrdlicka had chief responsibility.

After missing this "critical" week of work, Eko emailed Spadine in HR for assistance. Eko and Spadine ultimately decided that the behavior warranted issuing Hrdlicka an Attendance Letter, which made very clear that Hrdlicka's "job [was] in jeopardy" and that her attendance and tardiness needed to improve. Yet the tardiness persisted. Eko terminated Hrdlicka after three days of tardiness immediately following the issuance of the Attendance Letter.

The chronic tardiness and repeated absences, coupled with Hrdlicka's immediate failure to abide by her Attendance Letter, were clearly legitimate, nondiscriminatory reasons to terminate her. *See Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 528 (6th Cir. 2015) (finding that excessive absenteeism and tardiness were legitimate, nondiscriminatory reasons for terminating an employee (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004)). Eko's call for "HELP!" in her email to Spadine after Hrdlicka missed the summer-intern presentations fully demonstrates that there were legitimate concerns about Hrdlicka's attendance.

### iii.  *Hrdlicka failed to establish pretext*

Once an employer proffers a legitimate, nondiscriminatory reason for making an adverse employment decision, the employee must present proof that the stated reason is pretextual in order to create a genuine dispute regarding a claim of disability discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  To establish pretext, the employee must show "that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action."  *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Hrdlicka offers practically no substantive analysis of pretext, and the record contains no evidence that could support such a finding.  First, General Motors's legitimate, nondiscriminatory reason to terminate Hrdlicka clearly had a basis in fact, and Hrdlicka does not argue otherwise.  There is no dispute that she was both late and absent on multiple occasions.  Second, the record reveals that General Motors was, in fact, motivated by Hrdlicka's poor attendance.  Eko communicated her attendance concerns to Hrdlicka in a June 2019 meeting, included those concerns in Hrdlicka's mid-year review, reached out to HR about addressing the attendance concerns, and ultimately issued a formal Attendance Letter in August.  When Hrdlicka continued to arrive to work late despite her Attendance Letter, she was terminated.

There is also no basis to argue that Hrdlicka's poor attendance record was insufficient to warrant her termination.  As noted above, the attendance issues were chronic and persistent, even after multiple warnings.  Further, Hrdlicka failed to attend the important final week of the summer internship, which was critical to her role.  Hrdlicka does not challenge these facts and has not established a genuine dispute as to whether her actions were insufficient to warrant termination.

Similarly, Hrdlicka has offered no evidence to establish that the denial of her open-door appeal or the issuance of her Attendance Letter were pretextual.  She claims that the denial of her open-door appeal was made "in reaction to and predicated on the then recent diagnosis" of

Persistent Depressive Disorder and a brain tumor. There is no evidence in the record, however, to support this assertion other than Hrdlicka's own conclusory allegations.

The record is clear that JustUs did not consider Hrdlicka's post-termination diagnoses when denying her appeal, but instead relied solely on evidence available at the time of her termination. *See id.* ("We have not required that the employer's decision-making process under scrutiny 'be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998))). Further, the record is clear that JustUs rested its decision on a finding that General Motors terminated Hrdlicka in accordance with its established policies—not on the existence of a post-termination medical diagnosis.

Hrdlicka has not offered any material evidence to challenge these facts. She has therefore failed to rebut General Motors's legitimate, nondiscriminatory reason for its adverse employment action.

### b. Failure to accommodate

Hrdlicka also argues that General Motors failed to reasonably accommodate her disability. We disagree. The ADA requires employers to make reasonable accommodations. 42 U.S.C. § 12112(b)(5)(A). The parties agree that the analysis is the same under both the ADA and the PWDCRA. To establish a failure to accommodate, an employee must show: "(1) that he is disabled, and (2) that he is 'otherwise qualified for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation.'" *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007)). An employee bears the burden of demonstrating that a proposed accommodation "seems reasonable on its face." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1229 (6th Cir. 2022) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)).

The only accommodation that Hrdlicka requested was a transfer back to the Sculpting Department. Although she also made earlier requests to transfer back to Sculpting, only this renewed request made while meeting with Banks and Spadine on August 19, 2019 can reasonably be interpreted as a request for a disability accommodation. There is no genuine dispute that, in originally requesting a transfer, Hrdlicka's motivation was based on her dislike of the Design Academy and the people within it. Hrdlicka presented no evidence that she ever linked this request to a disability. General Motors therefore could not have interpreted the initial request as a request for an accommodation under the ADA. *See Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016) ("[I]n requesting an accommodation, we require plaintiffs not only to request to be accommodated, but to also provide their employers with a sufficient basis to understand that the request is being made because of their disability.").

Hrdlicka's renewed request for a transfer to the Sculpting Department when she met with Banks and Spadine is closer to a request for an accommodation under the ADA and the PWDCRA because, as noted above, she explicitly stated that she was "depressed." Based on the facts in the record, however, this request was not "reasonable." A transfer request is not reasonable if it was made to avoid working with certain people. *Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 858 (6th Cir. 2002). A court is not in a position to "act as a super-bureau of Human Resources" and determine who should work with whom. *Id.*

Hrdlicka herself conceded during her deposition that, when meeting with Banks and Spadine, she "complained about Kathy Englehart and Eko's lack of leadership at this meeting" and that her tardiness was "related to [her] current work environment created by [Eko]." In other words, she attributed her attendance issues to the work environment and to her supervisor. She explicitly noted that her depression began once she was transferred to the Design Academy, and that this "precipitated her request for a transfer back to Sculpting."

These facts compel the conclusion that her transfer request was specifically linked to her distaste for her current work environment. Basically, it was a desire to "force [the defendant] to transfer [her] so that [she] will not be required to work with certain people." *See id.*; *see also Deister*, 647 F. App'x at 658 n.2 ("[A]n employer is not obliged to honor, as a 'reasonable accommodation,' an employee's request for assignment to a different supervisor." (citing

*Burdett-Foster v. Blue Cross & Blue Shield of Mich.*, 574 F. App'x 672, 680 (6th Cir. 2014))); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996) (finding that a request for a different supervisor is not a reasonable accommodation because that would ask the court to allow her to "establish the conditions of her employment").

Even assuming that Hrdlicka adequately attributed her request to a disability and not just to a desire to escape the Design Academy, her request was untimely. "When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late.'" *Parsons v. Auto Club Grp.*, 565 F. App'x 446, 449 (6th Cir. 2014) (quoting *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012)). The plaintiff in *Parsons*, for example, requested an accommodation only a day before he was suspended and a week before he was terminated. *Id.* By then, the employer had already completed a five-month investigation finding that Parsons had violated company policies and had lied to investigators. *Id.* The court concluded that this request for an accommodation "likely came too late to be considered reasonable." *Id.*

Similarly, Hrdlicka's request came after a long history of attendance issues and a warning that her "job was in jeopardy" if she did not improve. After Hrdlicka arrived late for three successive days immediately following the issuance of her Attendance Letter, she was terminated. Her last-minute request for a transfer back to the Sculpting Department was not reasonable under the circumstances.

Hrdlicka has also failed to show that General Motors violated its duty to engage in an interactive process regarding an accommodation. "[O]nce an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Blanchet*, 27 F.4th at 1232 (quoting *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018)). The purpose of the duty is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007)).

General Motors did not violate a duty to engage in an interactive process because the duty is an independent violation of the ADA only "if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation." *Id.* at 1041. As discussed above, Hrdlicka did not request a reasonable accommodation and, therefore, General Motors did not fail to engage in an interactive process.

Hrdlicka has ultimately failed to establish a failure-to-accommodate claim because she did not identify a reasonable accommodation. Her reliance on *Cehrs v. Northeast Ohio Alzheimer's Research*, 155 F.3d 775 (6th Cir. 1998), and two out-of-circuit cases cited therein does not persuade us otherwise. *Cehrs* and the other two cited cases are clearly distinguishable because, among other reasons, the employer in those cases was on full notice of the employee's diagnosed disability and need for an accommodation *prior to* making the termination decision. We find no authority for Hrdlicka's argument that the ADA imposes an obligation on employers to provide an accommodation for a disability that is first discovered post-termination. Moreover, nothing in the official E.E.O.C. Guidance suggests a deviation from this established principle simply because the employer provides a post-termination appeal process. *See E.E.O.C. Enforcement Guidance, The Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities*, 2008 WL 4786697, at \*12-13 (Sept. 25, 2008). We therefore find no merit in her ADA and PWDCRA claims for a failure to accommodate.

## C.    FMLA claim

We now turn to Hrdlicka's FMLA claim. The FMLA provides eligible employees with the right to take up to 12 weeks of leave per year when the employee suffers from a "serious health condition that makes the employee unable to perform the functions" of her job. 29 U.S.C. § 2612(a)(1)(D). This court recognizes two distinct theories for recovery under the FMLA: (1) the "'entitlement' or 'interference'" theory under 29 U.S.C. § 2615(a)(1), and (2) the "'retaliation' or 'discrimination'" theory under 29 U.S.C. § 2615(a)(2). *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555 (6th Cir. 2006) (quoting *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Hrdlicka pursues only the entitlement/interference theory (referred to below as the "interference theory" for simplicity) on appeal.

The interference theory applies when an employer attempts to "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA leave rights.  29 U.S.C. § 2615(a)(1).  To establish a prima facie case of FMLA interference, an employee must show "(1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled."  *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (quoting *Killian*, 454 F.3d at 556).

We need not belabor the FMLA analysis because Hrdlicka's interference claim clearly fails under the fourth prong because she did not provide adequate notice of her intention to take FMLA leave.  An employee must provide "notice and a qualifying reason for requesting the leave."  *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005) (quoting *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998)).  Although an employee does not have to expressly mention the term "FMLA," she must provide enough information for her employer to know that an FMLA qualifying event has occurred.  *Id.* (citing *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 451 (6th Cir. 1999)).  "The critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job."  *Koch v. Thames Healthcare Grp., LLC*, 855 F. App'x 254, 256 (6th Cir. 2021) (quoting *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004)).

As with her ADA and PWDCRA claims, Hrdlicka relies heavily on her text-message communications with Eko to establish FMLA notice.  But for the same reason discussed above with regard to her ADA and PWDCRA claims, these messages are insufficient.  Hrdlicka's general references to her head "really hurting," feeling "sick," or having a "fever and other symptoms" are simply generalized descriptions of ailments that do not rise to the level of "serious health conditions" within the meaning of the FMLA.  *See* 29 C.F.R. § 825.113(d) ("Ordinarily, unless complications arise, the common cold, the flu, . . . headaches other than migraine, . . . etc., are examples of conditions that do not meet the definition of a serious health

condition and do not qualify for FMLA leave."); *see also Beaver v. RGIS Inventory Specialists, Inc.*, 144 F. App'x 452, 456–57 (6th Cir. 2005) (finding no FMLA notice, in part because the plaintiff used only "general terms when describing her health such as she 'didn't feel good,' was 'sick,' and 'needed a couple of days to get better'").

The better argument is when Hrdlicka more explicitly referenced having "depression" in her meeting with Banks and Spadine shortly before she was terminated. But this conversation was not accompanied by any request for FMLA leave despite the fact that Hrdlicka was familiar with the process because she herself had already taken FMLA and maternity leave when she had had her two children. Moreover, the possibility of taking FMLA leave was directly stated in her Attendance Letter, which was both read and emailed to Hrdlicka. *See Brenneman*, 366 F.3d at 428 (noting that an employer is not required to be "clairvoyant" when determining if an employee needs leave).

Hrdlicka's own admissions reveal that her statements made during the meeting with Banks and Spadine would not have put General Motors on notice of a "serious health condition." The analysis is substantially the same as that discussed in Part II.B. above. Hrdlicka's conclusory allegations that her depression led to her attendance issues is contradicted by her own deposition, where she directly stated that "the reasons for [her] recent tardiness [were] related to [her] current work environment created by [Eko]." So, even under Hrdlicka's version of the conversation, her primary concern stemmed from a disdain for her work environment.

In sum, Hrdlicka made only a single statement that she was depressed, which was not made in the context of requesting time off, but as a justification for her desire to transfer back to the sculpting Department (and to *continue* working, not stop working as FMLA leave would entail). We therefore conclude that Hrdlicka has failed to establish that General Motors was on notice of her desire to take FMLA leave.

**D. ERISA claim**

We next consider Hrdlicka's ERISA claim. Section 510 of ERISA prohibits an employer from terminating an employee for the purpose of interfering with the employee's rights under an employee-benefit plan. In relevant part, Section 510 states:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140.

To establish a violation of Section 510 of ERISA, an employee must show "the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997). Importantly, the employer must have had a "specific intent to violate ERISA." *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992) (quoting *Rush v. United Techs., Otis Elevator Div.*, 930 F.2d 453, 457 (6th Cir. 1991)). The employee must show that interfering with her rights was at least a "motivating factor" in the decision. *Id.* (citations omitted). Once the employee establishes a prima facie case, the employer can rebut by offering a "legitimate, nondiscriminatory reason for its challenged action." *Id.* (citation omitted). If the employer does so, then the employee has the burden to prove that interference was nonetheless a motivating factor or to establish that the explanation was pretextual. *Id.* (citations omitted).

The only decision that Hrdlicka claims was a violation of ERISA was General Motors's denial of her open-door appeal. But General Motors clearly had a legitimate, nondiscriminatory reason for denying Hrdlicka's open-door appeal, and Hrdlicka has not shown that the reason was pretextual or that interference with her rights was nonetheless a motivating factor. JustUs based its denial on the facts that Hrdlicka had chronic attendance issues in the months leading up to her termination and that General Motors acted in accordance with its established policies. The record also fully shows that the open-door review was based solely on the facts in existence at the time Hrdlicka was terminated. In resting on Hrdlicka's well-documented attendance issues,

JustUs decided the appeal using a legitimate, nondiscriminatory justification that was fully consistent with the scope of its authority.

Hrdlicka has offered no material evidence challenging the JustUs decision. Her main argument focuses on the fact that her appeal was denied shortly after JustUs was informed of Hrdlicka's brain tumor. But simply pointing out the temporal proximity does nothing to rebut the fact that JustUs based its decisions on the facts that were available to General Motors *at the time it terminated Hrdlicka*. Her post-termination diagnoses did not factor into the analysis, and Hrdlicka has offered no evidence to the contrary. Her ERISA claim therefore fails.

**E.      Age discrimination under the ADEA and the ELCRA; race and sex discrimination under Title VII and ELCRA**

This leaves Hrdlicka's claims of age, race, and sex discrimination. These claims are woefully insufficient and require little analysis to dispose of each. There is simply no genuine dispute that General Motors presented legitimate, nondiscriminatory reasons for each of the alleged discriminatory employment actions, and Hrdlicka has failed to establish any pretext. Hrdlicka's briefing is not entirely clear, but she appears to challenge General Motors's decision to (1) deny her transfer request, and (2) to deny her open-door appeal for reinstatement. We thus analyze these two alleged adverse actions.

### a.  Age discrimination under the ADEA and the ELCRA

The ADEA and the ELCRA prohibit firing or otherwise discriminating against employees on the basis of age.  29 U.S.C. § 623(a)(1); Mich. Comp. Laws § 37.2202(1)(a).  Age-discrimination claims under both the ADEA and the ELCRA utilize the *McDonell Douglas* framework.  *Lewis v. City of Detroit*, 702 F. App'x 274, 278–79 (6th Cir. 2017) (citing *Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 704 (6th Cir. 2016)).  The employee must first establish a prima facie case; the burden then shifts to the employer to establish a legitimate, nondiscriminatory reason for the adverse employment action; if it does so, the burden shifts back to the employee to establish pretext.  *See id.* at 281–84; *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 68 (Mich. 1997), *abrogated in part on other grounds by Gross v. FLB Fin. Servs., Inc.*, 557 U.S. 167 (2009).

General Motors's reasons for denying Hrdlicka's transfer request are that (1) Hrdlicka's original sculpting position was eliminated over a year prior, (2) Hrdlicka no longer possessed the requisite skills to be a sculptor, and (3) General Motors was unwilling to transfer Hrdlicka unless it could backfill her existing position.  The reason for denying Hrdlicka's open-door appeal was that she was appropriately terminated in accordance with General Motors's policies because of a history of attendance issues.

These reasons have nothing to do with Hrdlicka's age.  Hrdlicka's conclusory statement, without evidence, that General Motors's decisions had "no basis in fact" is insufficient to establish a genuine dispute as to pretext.  There is no other attempt to demonstrate that her age was a motivating factor behind the denial of her transfer.  This claim is therefore without merit.

### b.  Race and sex discrimination under Title VII and the ELCRA

Title VII applies when an employer attempts to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race or sex.  42 U.S.C. § 2000e-2(a)(1).  The ELCRA similarly prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of" race or sex.  Mich. Comp. Laws § 37.2202(1)(a).

Just like the age-discrimination claims, Hrdlicka's claims of sex and race discrimination rely on circumstantial evidence and therefore utilize the *McDonnell Douglas* framework. *See Town*, 568 N.W.2d at 67–68. Also like the age-discrimination claims, there is no genuine dispute that General Motors had legitimate, nondiscriminatory reasons for denying Hrdlicka's transfer and denying her open-door appeal. The same legitimate, nondiscriminatory reasons that General Motors advances against a finding of age discrimination apply equally to the claims of sex and race discrimination.

General Motors clearly established that its decision to deny Hrdlicka's transfer was not based on either sex or race, but entirely premised on the fact that her prior sculpting position had been eliminated, that Hrdlicka no longer possessed the skills to be a sculptor, and that the Design Academy needed to backfill her position before she could transfer. Likewise, her open-door appeal was denied solely due to a finding that she had well-documented, chronic attendance issues. There is no evidence that sex or race had any influence on these decisions. The claims therefore lack merit.

## III.  CONCLUSION

Hrdlicka's post-termination diagnoses of serious health conditions are indeed unfortunate but, for the reasons discussed above, they do not create a genuine dispute of material fact that would justify denying General Motors's motion for summary judgment. We therefore **AFFIRM** the judgment of the district court.