RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0044p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

KELLY BLANCHET,

        *Plaintiff-Appellant*,

    *v.*

CHARTER COMMUNICATIONS, LLC,

        *Defendant-Appellee*.

No. 21-5073

———————

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:18-cv-00188—William O. Bertelsman, District Judge.

Decided and Filed:  March 8, 2022

Before:  MOORE, KETHLEDGE, and DONALD, Circuit Judges.

———————

## COUNSEL

**ON BRIEF:**  Robert F. Croskery, CROSKERY LAW OFFICES, Cincinnati, Ohio, for Appellant.  C. Celeste Creswell, KABAT CHAPMAN & OZMER LLP, Atlanta, Georgia, for Appellee.

DONALD, J., delivered the opinion of the court in which MOORE, J., joined. KETHLEDGE, J. (pg. 13), delivered a separate dissenting opinion.

———————

## OPINION

———————

BERNICE BOUIE DONALD, Circuit Judge.  Plaintiff-Appellant Kelly Blanchet appeals the district court's order granting summary judgment in favor of Defendant-Appellee

Charter Communications for her claims under the Americans with Disabilities Act ("ADA"). We REVERSE and REMAND to the district court for further proceedings.

**I.**

In July of 2014, Charter Communications hired Kelly Blanchet as a Direct Sales Representative ("DSR"). As a DSR, Blanchet was responsible for selling Charter's services door-to-door in residential neighborhoods. Blanchet quickly excelled in her role, receiving positive feedback from her closest supervisors. For example, her long-time supervisor, Ryan Quigley, identified her as "one of [his] top producers." Quigley added that she "always was at work on time" and that he could "always depend on her being where she should be." Another supervisor, Jayson Docter, stated that Blanchet was "probably the top person on [his] team every month."

During Blanchet's employment, she became pregnant and requested maternity leave. She applied for and received Charter's standard maternity leave, short-term disability benefits, and Family and Medical Leave Act (FMLA) benefits until September 4, 2016. After giving birth to her child on July 11, 2016, Blanchet developed postpartum depression. As a result of her medical condition, Blanchet requested an accommodation of additional leave under the FMLA, which extended past her initial return-to-work date of September 4, 2016. At that time, Sedgwick, a third party who administered disability leave for Charter, was primarily responsible for all direct communications with employees who requested leave.

Charter made clear that Blanchet should *not* communicate directly with the company regarding disability leave, but should communicate with Sedgwick *only*. For example, Blanchet's supervisor, Ryan Quigley, directed Blanchet to speak with Sedgwick only. Thus, Sedgwick was the only party that Blanchet communicated with to request leave for her disability.

Charter approved Blanchet's requests for accommodations from September 4, 2016, to February 1, 2017. Blanchet first sought and was approved for FMLA leave until it was exhausted on September 30, 2016. Blanchet then obtained short-term disability leave until it was exhausted on January 8, 2017. Charter subsequently approved Blanchet for long-term disability leave through February 1, 2017, as an ADA accommodation.

During that time, Sedgwick had a pattern and custom of having paperwork approvals delayed long after the initial verbal approval.  For example, Blanchet did not receive formal approval for her first request for disability leave until February 3, 2017, two days after she was expected to return to work.

On February 3, 2017, Sedgwick received a letter from Blanchet's doctor which indicated that Blanchet's return to work date was "unknown at this time" but that Charter should "expect April" as a timeframe for her to return to work.  The letter also indicated that Blanchet "would not be capable of working from home or in any other setting due to her severe depression."

On the same day, Blanchet contacted a Sedgwick representative because she was concerned that she had exhausted her FMLA benefits and did not know how that would impact her employment with the company.  Blanchet requested a 60-day accommodation, from February 2017 through April 3, 2017, to allow herself time to adjust to her new medications.  When Blanchet contacted the Sedgwick representative about this extension, the representative assured Blanchet "not to worry about [her] job" and that "they were [her] job protection."  After Blanchet followed up a few weeks later with a Sedgwick representative, she was assured that "all was ok," the representative "knew of no reason this [application] would not be approved," and that Blanchet should be "receiving [her] approval letter for April 3, 2017."

Blanchet relied on that verbal approval and continued her treatment with the psychiatrist. On March 9, 2017, Blanchet received a termination letter from Charter stating that she was separated from the company "effective January 10, 2017."  Prior to receiving this termination letter, no representative from Charter or Sedgwick contacted her to explain that her request for an accommodation was not reasonable.  In addition, no representative from either Charter or Sedgwick requested additional medical records or reached out to inquire for more details on Blanchet's condition.

Ten days after Blanchet received her termination letter, she received an approval letter for her request for extended leave as an accommodation.  Unbeknownst to Blanchet, Fred Contreras, the HR Manager of Charter, had been in conversation with Sedgwick after an inquiry requesting his response to Blanchet's request for approval.  On February 22, 2017, Sedgwick emailed

Contreras, informing him that a request for a leave of absence was pending for Blanchet, but that it received notice of termination as of January 9, 2017. Sedgwick asked Charter to "review this employee[']s employment status and confirm." On March 2, 2017, Sedgwick "escalated" the response as it had not heard from Contreras regarding the request. By March 10, 2017, one day after Blanchet received the termination letter, Contreras sent an email to Sedgwick that he has "responded twice to the request for extension before" and it is "ok with [Charter]."

Blanchet subsequently sued Charter after having filed a discrimination charge with the Equal Employment Opportunity Commission. The first count of her operative complaint, entitled "Disability Discrimination," alleges that "[t]he action of Defendant Charter Communications in firing Plaintiff Kelly Blanchet is in violation of The Americans with Disabilities Act of 1990." Charter moved for summary judgment, and the district court granted the motion. Blanchet appealed.

## II.

We review a district court's grant of summary judgment *de novo*. *See E.E.O.C. v. Prevo's Fam. Mkt., Inc.*, 135 F.3d 1089, 1093 (6th Cir. 1998). A grant of summary judgment may be upheld only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). A genuine dispute of material fact exists if a reasonable jury—viewing the evidence in favor of the nonmovant—could decide for the nonmovant. *Id.* at 248. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" when he is ruling on a motion for summary judgment. *Id.* at 255 (citing *Adickes v. S H. Kress & Co.*, 398 U.S. 144, 155-56 (1970)). "Where there is a genuine issue of material fact, summary judgment is not appropriate." *Henschel v. Clare County Road Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013).

**A.  Appropriate Framework**

The ADA prohibits discrimination against a qualified individual based on disability. 42 U.S.C. § 12112(a).  Disability discrimination includes a failure to make reasonable accommodations.  § 12112(b)(5)(A).  Employees can prove discrimination in two ways, either directly or indirectly, and each has its own test.  *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (citing *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891-92 (6th Cir. 2016)).

The parties dispute which test applies to Blanchet's failure to accommodate claim. Charter contends that the district court correctly applied the indirect evidence test.  However, Blanchet argues that the direct evidence test should have been applied.

The distinction between when to apply the direct versus the indirect evidence test is "vital because the framework for analyzing the two kinds of cases differs."  Since failure to accommodate is expressly listed in the Act's definition of disability discrimination, *see* 42 U.S.C. § 12112(b)(5)(A), "claims *premised* upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination."  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citation omitted and emphasis added).  We therefore apply the direct evidence test to failure to accommodate claims.  *See, e.g.*, *Fisher v. Nissan North Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020); *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020).

Although Charter argues that we cannot apply the direct evidence test because Blanchet did not plead a failure to accommodate claim, this reasoning is incorrect.  Under our precedent, the plaintiff needs only to allege facts *premised* upon an employer's failure to accommodate for this court to apply the direct evidence test at summary judgment.  *See Kleiber*, 485 F.3d at 868. In Blanchet's complaint, she alleged that she "requested an extension of her leave as a workplace accommodation" from October 1, 2016, through February 3, 2017.  Blanchet also argued that Charter "unlawful[ly] fir[ed]" her because her termination was "effective" during her approved accommodation.  Since the record reflects that Blanchet's claim was based on Charter's failure to accommodate, it "necessarily involves" direct evidence of discrimination under the ADA. *Kleiber*, 485 F.3d at 868.

Charter also argues that Blanchet "waived" the applicability of the direct evidence standard by failing to raise it below. Claims can be "either forfeited or waived—the former is a party's 'failure to make the timely assertion of a right' while the latter 'is the intentional relinquishment or abandonment of a known right.'" *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 443 (6th Cir. 2021) (quoting *United States v. Petlechkov*, 922 F.3d 762, 767 (6th Cir. 2019)). Nothing in the briefing below indicates that Blanchet contested the application of the direct evidence standard, so Blanchet did not waive her argument. It is also unclear whether Blanchet forfeited the application of the direct evidence standard, considering that her original complaint encompasses a failure to accommodate claim. And as noted above, a failure to accommodate claim necessarily implicates the direct evidence standard. *Kleiber*, 485 F.3d at 868. The district court therefore erred in applying the indirect evidence test to Blanchet's failure to accommodate claim. *See Hostettler*, 895 F.3d at 853.

Even if Blanchet did forfeit her argument that the direct evidence test should apply, courts have discretion to consider forfeited arguments in "exceptional cases" or when application of the rule would produce a "plain miscarriage of justice." *Redbubble*, 989 F.3d at 445 (quoting *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 528 (6th Cir. 2014). The forfeiture rule "is justified by two main policy goals. First, the rule eases appellate review by having the district court first consider the issue. Second, the rule ensures fairness to litigants by preventing surprise issues from appearing on appeal." *Cooley*, 759 F.3d at 528 (quoting *Rice v. Jefferson Pilot Fin. Ins. Co.*, 578 F.3d 450, 454 (6th Cir. 2009)).

Here, the policies underlying the forfeiture rule do not apply. The issue at the heart of this case is whether the leave Blanchet requested was a reasonable accommodation for her disability, and thus whether her firing was lawful. Because the *McDonnell Douglas* standard requires a plaintiff to show that she is qualified "with or without a reasonable accommodation," the issue of the reasonableness of Blanchet's requested leave was fully briefed before and considered by the district court. It was also fully briefed before this court—indeed, Charter addressed its argument under the proper standard in its brief. Even if this claim were forfeited, this would be an "exceptional case" justifying the court's discretion to consider it under the correct legal framework.

**B. Failure to Accommodate**

Under the direct evidence test, Blanchet bears the initial burden of establishing that (1) she is disabled, (2) she is "'otherwise qualified' for the position despite his or her disability." *Kleiber*, 485 F.3d at 869 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)) (citations omitted). Charter then bears the burden of "proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon" the company. *Id.* (citation omitted).

Charter does not dispute that Blanchet is disabled. Therefore, we proceed to the second element of Blanchet's proof.

### 1. "Otherwise Qualified"

To meet the plaintiff's *prima facie* burden that she is otherwise qualified for her position, she must show that "she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kleiber*, 485 F.3d at 869. "[T]he burden of making out a *prima facie* case is not an onerous one." *Hostettler*, 895 F.3d at 855. Blanchet cannot establish that she is "otherwise qualified" for her position without an accommodation or with an essential function removed, and she does not argue otherwise. This case addresses whether Blanchet was otherwise qualified for her position with Charter *with a proposed reasonable accommodation*.

Charter argues that an employee's qualifications must be determined at the time of termination, citing an unpublished opinion that addressed age, rather than disability discrimination. Indeed, Charter's brief details at length Blanchet's condition as of March 9, 2017, the date Charter sent Blanchet the termination letter. Charter argues that Blanchet could not perform any of her essential job functions "as of the date of her termination, including attending work." Charter argues further that Blanchet was not medically released to return to work. The district court agreed.

When an employee's proposed accommodation is medical leave, examining her qualifications on the date of her termination does not indicate whether she is otherwise qualified *with an accommodation*. Employees requesting medical leave often cannot perform their jobs when they request leave, and medical leave allows them time to recover from illnesses or medical procedures. To accept Charter's supposed rule, an employee requesting medical leave could always be terminated if she were unable to work at the time of her request. But that cannot be the case because we have held that "medical leave can constitute a reasonable accommodation under the ADA." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017). We must therefore determine whether Blanchet would be "otherwise qualified" to perform her essential job functions with her proposed accommodation, in other words, when she returned to work. *See id*. (analyzing whether plaintiff could be otherwise qualified for job after medical leave as accommodation separately from analysis as to whether plaintiff was qualified without leave).

A reasonable juror could find that Blanchet would be otherwise qualified for her job after her medical leave accommodation. As Blanchet's supervisors testified, prior to her illness, Blanchet was a "top producer[]," was "always at work on time," and "probably the top person" on her teams. At the time Blanchet requested her accommodation, Charter had no reason to conclude that Blanchet's performance would deteriorate when she came back on her proposed return date. Charter points to evidence that Blanchet did not return to work until 2019 to show that she could not have come back to work in April 2017. But a reasonable jury could find not-at-all surprising that an unexpected termination would derail Blanchet's recovery from mental illness, requiring her to take more time off from work.

For the same reason, we reject Charter's argument that Blanchet was not qualified because attendance was an essential function of her work. Blanchet was not requesting an accommodation that would permanently remove attendance as a requirement for her position, by, for example, allowing her to telework or work part-time. *See, e.g.*, *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 763 (6th Cir. 2015) (en banc). In asking for an extension of medical leave, Blanchet requested a temporary accommodation in the hopes that she could fully fulfill the attendance requirement once her medical leave was over. Because a reasonable jury could find

that Blanchet could have returned to work and attended her job after she recovered from her illness, a genuine dispute of material fact exists as to whether she was "otherwise qualified" for her position.

## 2. Reasonable Accommodation

The ADA requires employers to "mak[e] reasonable accommodations." 42 U.S.C. § 12112(b)(5)(A). Blanchet bears the burden of showing that an "'accommodation' seems reasonable on its face." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). Determining the reasonableness of a proposed accommodation is a question of fact. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). If the employee meets her burden, the employer must then show "special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances," *Barnett*, 535 U.S. at 402, or that the accommodation would eliminate an essential job requirement. *Kleiber*, 485 F.3d at 869.

Blanchet argues that her request for temporary leave as an accommodation was reasonable because (1) her doctor provided Charter with a clear time frame to expect her return, (2) one of Charter's senior human resources officials, Karen Jolly, considered a 60-day extension "possible", and (3) Sedgwick verbally approved her accommodation before she received her termination letter.

Charter argues that Blanchet's request was unreasonable *per se* because Blanchet's doctor's note claiming to "expect April" for Blanchet's return was too vague to constitute a definitive date and that neither Contreras nor Sedgwick were authorized to approve a terminated employee's leave.

"Medical leave as an accommodation is not a novel concept." *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.,* 155 F.3d 775, 782 (6th Cir. 1998) (citing *Asonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 71-74 (1986)). In *Norris v. Allied-Sysco Food Services Inc.*, the United States District Court for the Northern District of California took a broad view of medical leave, stating that it was "not sure that there should be a '*per se*' rule . . . that leave of indefinite duration (or a very lengthy period, such as one year) could never constitute a 'reasonable accommodation' under the ADA." 948 F. Supp. 1418, 1439 (N.D. Cal. 1996) (citations

omitted). Applying that reasoning, the *Norris* court concluded that since the employee's leave would not unduly burden the employer, summary judgment was improper. *Id.* We applied *Norris*'s analysis in *Cehrs*, holding that "[i]f an employer cannot show that an accommodation unduly burdens it, then there is no reason to deny the employee the accommodation." *Cehrs*, 155 F.3d at 782.

A reasonable jury could find that Blanchet's proposed accommodation was reasonable from the fact that Charter considered it reasonable. Blanchet testified that Sedgwick told her it was "in communication with Charter and the new HR representative, Mr[.] Frederic Contr[er]as, and that [she] would shortly be receiving [her] approval letter" (from which it is reasonable to infer that Charter indeed approved her request). Further, Karen Jolly, a senior human resources official at Charter, stated that the type of accommodation that Blanchet was seeking, a request for a 60-day accommodation, could be "possible" for a Charter employee. This proposition was confirmed by the record when Sedgwick contacted Contreras regarding Blanchet's request for extended leave on March 10, 2017, before Blanchet received her termination letter but after Blanchet was "effective[ly]" terminated. Contreras confirmed via email that he "responded twice to [Blanchet's] request for [an] extension before" and that it was "ok with [Charter]." Charter followed up ten days after Blanchet received her termination letter with an approval for her extended accommodation from February 3, 2017, through April 3, 2017.

A jury could conclude, as Charter contends, that Charter mistakenly approved Blanchet's leave after firing her. Or it could conclude that Charter management fired Blanchet, forgot that it fired her, and approved the leave because it seemed reasonable notwithstanding the termination which they forgot about. In any case, a factfinder could use those datapoints to infer that Charter considered the leave was reasonable and fired Blanchet anyway. Charter's fatal administrative mistakes and lack of clarity regarding Blanchet's termination date thus raise genuine disputes of material fact as to whether a "reasonable accommodation" was possible.

Charter relies on *Williams*, 847 F.3d at 394, in support of its position that a doctor's estimate of a return-to-work date is not a "clear prospect of recovery," and that Blanchet's doctor note is merely an estimate, rather than a firm return-to-work date. However, in *Williams*, the employee struggled with attendance prior to her need for an accommodation under the ADA and

requested leave only after periods of unexplained absences. Due to this history of absenteeism, any proposed accommodations to grant leave were deemed unreasonable. *Id.* at 388. Blanchet has presented a clearer prospect of returning to work than the employee in *Williams*, who had "struggled with attendance throughout her employment" and had "repeatedly taken leaves of unspecified duration." *Id.* at 388, 394. Blanchet requested approval from Charter before taking any leave, requested leave for specified periods, and provided medical support for each of her absences in advance. Blanchet also did not have a history of absenteeism before she became pregnant. In fact, she had excellent attendance, as previously discussed.

Charter also relies on *Walsh v. United States Parcel Service*, 201 F.3d 718, 722 (6th Cir. 2000). However, in *Walsh*, the employee's doctor noted that he "was offering no active treatment and expected no significant change in [the employee's] condition over the next twelve to eighteen months." *Id.* Unlike in *Walsh*, Blanchet's physician indicated that she was treating Blanchet with therapy and medications. A reasonable jury could find that Blanchet could recover from her illness within an acceptable time.

The plaintiffs who provided any estimated return date in *Williams* and *Walsh*, moreover, knew that they may be fired if they did not credibly demonstrate when they would return to work. *See Williams*, 847 F.3d at 388 (employer gave plaintiff multiple warnings that she needed to improve her attendance or risk termination); *Walsh*, 201 F.3d at 723 (employer told plaintiff that he would be terminated unless employer received documentation to support need for accommodation by a certain date). These plaintiffs thus had every incentive to work with their physicians to clearly determine exactly when they could go back to work and communicate that fact to their employers.

Blanchet, believing that her leave was approved from Sedgwick and Charter's representations, did not know that she had to "credibly prove" anything. Understandably so. When Blanchet received her termination letter on March 10, 2017, no one in HR leadership at Charter or Sedgwick contacted Blanchet to indicate that her request for an extended leave was unreasonable. Further, no representative contacted Blanchet to request medical records or to inquire for further information about her current condition. When Blanchet contacted Sedgwick to express concerns about her employment status and to communicate the reason for requesting

the additional extension, she was told that there would be "no reason her application would not be approved." We decline to require that a plaintiff provide an exact a return date when, as here, her employer leads her to believe she does not have to do so.

Importantly, "[o]nce an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Hostettler*, 895 F.3d at 857.[1] "The purpose of this process is to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Kleiber,* 485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)). Accordingly, "both parties have a duty to participate in good faith." *Id.* An employer is not participating in good faith if it "determine[s] what accommodation it [is] willing to offer before ever speaking with" the employee. *Mosby-Meachem v. Memphis Light, Gas & Water Div.,* 883 F.3d 595, 606 (6th Cir. 2018). Charter never spoke directly with Blanchet, decided to fire her before even telling her that the accommodation was unreasonable, and led Blanchet to believe that her accommodation would be approved. Charter cannot now use its failure to engage in the interactive process to argue that Blanchet's proposed accommodation was unreasonable. Especially when, viewed in the light most favorable to Blanchet, Blanchet's request was reasonable enough for Charter to approve it, Charter cannot shield itself from liability through failing to interact with Blanchet.

**III.**

Because genuine issues of material fact remain regarding Blanchet's disability discrimination claim, we REVERSE the district court's grant of summary judgment to Charter and REMAND for further proceedings.

---

[1]Charter also argues that Blanchet failed to assert an interactive process claim in her complaint. [Appellee's Br., p. 51 n.17.] Although Blanchet did not independently allege an interactive process claim, Charter's failure to engage in the interactive process is directly related to determining whether Blanchet's proposed accommodation was reasonable.

---

**DISSENT**

---

KETHLEDGE, Circuit Judge, dissenting. The outcome of this case turns upon whether Kelly Blanchet was a "qualified individual" under the Americans with Disabilities Act. An employee is deemed qualified only if she can perform all the essential functions of her job, with or without an accommodation. 42 U.S.C. § 12111(8). Blanchet did not meet that definition here.

Our caselaw on this point is straightforward. "An employer is not required to keep an employee's job open indefinitely." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017). And "additional leave is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated 'no clear prospects for recovery.'" *Id.* (quoting *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000)). Here, Charter terminated Blanchet only after affording her seven months of paid disability leave. Yet, at that point, she undisputedly could not perform the functions of her job and had not demonstrated a likelihood of being able to do so anytime soon. True, at the time of her termination, Blanchet's doctor estimated that she could return to work in April 2017. But a "physician's estimate of a return date alone does not necessarily indicate a clear prospect for recovery, especially where an employee has repeatedly taken leaves of unspecified duration and has not demonstrated that additional leave will remedy her condition." *Williams*, 847 F.3d at 394. That was the situation here: Charter had already extended Blanchet's leave five times, and neither she nor her doctor made any effort to demonstrate that a sixth extension would "remedy her condition." *Id.*

The district court faithfully applied our precedents when it granted summary judgment to Charter. I respectfully dissent.