NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0004n.06

Case No. 24-3915

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jan 05, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| WILLIAM SHEARS, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| FIRSTENERGY CORPORATION, | ) | DISTRICT OF OHIO |
| Defendant, | ) | |
| | ) | O P I N I O N |
| ENERGY HARBOR NUCLEAR | ) | |
| CORPORATION, as successor of and, oka | ) | |
| FirstEnergy Nuclear Operating Company, | ) | |
| Defendant-Appellee. | ) | |

Before: McKEAGUE, MURPHY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Energy Harbor Nuclear Corporation ("Energy Harbor") terminated longtime employee William Shears following an investigation into allegations of timesheet falsification. His termination came shortly after Energy Harbor granted Shears an accommodation that limited his shift to daytime assignment, as Shears's documented history of diabetes proved he could not work the night shift. Shears sued, alleging state and federal claims of disability and age discrimination, failure to accommodate his medical condition, and retaliation for requesting the accommodation and assisting his coworkers in complaints against supervisors.

The district court granted Energy Harbor summary judgment on all claims. Shears now appeals the dismissal of all but his claim for age discrimination. We AFFIRM.

**I.**

### A. Employment Background

Over the course of nearly 30 years, Shears held several roles at Energy Harbor. Most recently, he worked as a Maintenance Supervisor in the Instrument and Controls ("I&C") department. In 2012, doctors diagnosed Shears with Type 2 diabetes. This condition affects his ability to perform daily tasks because it impairs his vision, cognition, and stamina. Shears informed Energy Harbor of his diagnosis immediately, and Energy Harbor exempted Shears from extended night shifts as a workplace accommodation.

### B. Accommodation Request

The events giving rise to this case began in March 2019, when the Perry Nuclear Power Plant launched a scheduled refueling outage requiring most employees, including supervisors, to work twelve-hour night shifts. At the time, Shears reported to Jim Beahon, Superintendent of I&C. Shears and Beahon had history. In December 2018 and January 2019, Shears helped two employees file human resources ("HR") complaints against Beahon and other supervisors for allegedly creating a hostile work environment and for sexual harassment. According to Shears, Beahon's demeanor toward him changed after these incidents.

Beahon assigned Shears to a consistent 11:00PM to 11:00AM schedule during the refueling outage. But often, Shears's shift was scheduled to start earlier or end up to an hour and a half later. According to Shears, these overnight hours exacerbated his diabetes, impairing both his judgment and physical health. For this reason, says Shears, he spoke to Beahon "[m]ore than a dozen" times, including more than five closed-door conversations to discuss the issue during the outage. (Shears Dep., R. 40-3, PageID 917–18). During these conversations, Shears told Beahon "the shift was killing [him]," and he was "going to crash." (*Id.* at 919).

Beahon interpreted Shears's statements about his discomfort with the night shift as general complaints, not formal accommodation requests. Beahon explained that, over the years, Shears had mentioned that he disliked the nightshift because of his diabetes. So at first, Beahon took no action. At some point, however, Beahon advised Shears to obtain medical documentation if he wanted a schedule change. Shears submitted a doctor's note dated April 3, 2019. The note requested that Shears be "excuse[d] from work for medical reasons" for the five-day period covering April 3rd through April 7th and that he be restricted to the day shift for one month after that to allow time to "stabilize his medical condition." (Exhibit D, R. 40-6, PageID 1181). In response, Energy Harbor immediately placed Shears on leave and reinstated him to a day shift schedule when he returned.

## C. Termination

Shortly after Shears returned to work, Beahon audited Shears's time entries during the March 2019 outage. Because Shears's duties during the outage took place exclusively within the protected area of the plant, Beahon compared Shears's timesheet entries to his recorded badge access data for the protected area. Beahon's investigation revealed discrepancies in twenty-one of twenty-six time entries, with ten entries overstating Shears's hours by more than thirty minutes. These ten discrepancies ranged from 32 to 106 minutes per entry. Beahon compiled his findings into a spreadsheet and escalated the issue to HR and upper management.

Kevin Clark, Beahon's supervisor and then-Maintenance Manager, instructed Beahon to conduct a fact-finding interview with Shears, ensuring another manager was present. Beahon enlisted Brian Sutter, another superintendent, and together, they interviewed Shears about the timesheet discrepancies. Beahon reported back to Clark, who reviewed the gate entry and exit

times, which were contained in a transaction report provided by security. Based on the report and Beahon's interview with Shears, Clark agreed to recommend termination.

The Safety Conscious Work Review Team ("SCWRT") then engaged in its own separate investigation. The SCWRT met twice with Clark and Beahon about the investigation into Shears's timesheets and requested additional information from them as part of their investigation. Ruben Ordonez, a SCWRT member, also met with Shears about the time reporting issues. The SCWRT ultimately concurred with Clark and Beahon's recommendation to terminate.

Energy Harbor terminated Shears's employment in May 2019, citing unprofessionalism and falsification of time records. Shears denies any intent to falsify records. He attributes the discrepancies to his diabetic condition and asserts that other entries understated his time, effectively balancing the discrepancies.

**D. District Court Proceedings**

In December 2020, Shears filed suit in the Northern District of Ohio. Relevant here, he alleged that Energy Harbor violated the Americans with Disabilities Act ("ADA"), Ohio Revised Code § 4112, and Title VII by failing to accommodate his disability, discriminating against him because of it, and retaliating against him for engaging in protected activity—specifically, assisting other employees with filing HR complaints against Beahon and requesting an accommodation.[1]

Following discovery, Energy Harbor moved for summary judgment on all claims. Shears opposed the motion, arguing that genuine disputes of material fact remained as to whether (1) he adequately requested an accommodation; (2) Energy Harbor unreasonably delayed in responding; and (3) the stated reason for his termination was pretextual. The district court granted summary

---

[1] He also claimed age discrimination under the Age Discrimination in Employment Act ("ADEA"), which he abandons on appeal.

judgment in Energy Harbor's favor. It found that Shears was on notice that he should submit a doctor's note if he required a medical accommodation, and that Energy Harbor's prompt response after receiving the doctor's note weighed against a failure to accommodate. It also concluded that no reasonable jury could find Energy Harbor's timesheet-falsification justification to be pretextual and consequently dismissed the discrimination and retaliation claims. Shears now appeals.

## II.

We review de novo a district court's grant of summary judgment. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023). Summary judgment is appropriate if "there is no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of proving that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating whether such a dispute exists, we must "view[] all the evidence in the light most favorable to the nonmoving party." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020). Finally, because the "Ohio anti-discrimination law mirrors the ADA," we apply "the legal standard under the ADA to claims brought under both laws." *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022).

## III.

### A. Failure to Accommodate

In his briefing, Shears advanced a straightforward failure-to-accommodate claim. He argued that Energy Harbor failed to accommodate his disability by refusing to assign him to the day shift during the 2019 outage. He also asserted that his repeated complaints about worsening

symptoms and requests for a shift change should have triggered Energy Harbor's duty to engage in the interactive process, but the company failed to do so. He, therefore, took issue with the district court's conclusion that he did not request an accommodation until he presented the doctor's note to Energy Harbor. He contended that Energy Harbor's delay in granting his requested accommodation—waiting, instead, until he submitted a doctor's note—amounted to an unlawful failure to accommodate during the outage and arguably beyond.

At oral argument, however, Shears substantially reframed his argument. He conceded that Energy Harbor's request for medical documentation was not, in itself, problematic. And he no longer pointed to delay as the source of his claim. Instead, in his reframed argument, Shears argues that his termination constituted the failure to accommodate. Under this revised theory, says Shears, Energy Harbor should have excused the timesheet errors that arose during the period after he had placed Energy Harbor on notice of his disability-related struggles but before he submitted the doctor's note on April 3, 2019. In other words, Shears contends that Energy Harbor knew that his disability during this time was causing a cognitive impairment that could have led to his timekeeping errors, and his termination for those errors constituted a failure to accommodate because Energy Harbor was on notice of his need for accommodations. In his view, the company's decision to fire him in May for these discrepancies was itself a denial of reasonable accommodation. In effect, Shears pinpoints his termination as the basis for both his failure-to-accommodate and discrimination claims. This theory gets no traction.

As an initial matter, by conceding that Energy Harbor acted within its rights in requesting medical documentation, Shears relinquished his delay theory. Indeed, Shears waived this argument by formally abandoning it at oral argument. As such, we need not decide whether any delay in permitting Shears to switch to the day shift amounted to a failure to accommodate. *See*

*Karst Robbins Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 969 F.3d 316, 323 n.5 (6th Cir. 2020) (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)) (express concession at oral argument constituted waiver); *see also Olano*, 507 U.S. at 733 (noting that waiver occurs on the "intentional relinquishment or abandonment of a known right" (citation omitted)).[2]

As to his new theory of liability, Shears did not meaningfully develop this argument and arguably forfeited it. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022). Shears makes, at best, only an oblique reference to this new theory of liability for failure to accommodate in his opening brief, merely stating: "Shears was forced to work the night shift despite his cognitive impairment, leading the way to Appellee's pretextual firing of him." (Appellant's Br., ECF 19, 19). Then, in his reply, he attempts to tether the failure-to-accommodate analysis to the discriminatory discharge rationale. But that attempt fails because the essence of his argument is not that Energy Harbor failed to provide a reasonable accommodation in the first instance, but rather that it wrongfully terminated him for conduct allegedly caused by his disability. As explained below, however, a failure-to-accommodate claim requires proof that the employer denied a reasonable accommodation—not that it disciplined or discharged an employee whose disability allegedly contributed to the underlying conduct.

Even if the new argument is not forfeited, it fails on the merits. The ADA prohibits discrimination against a qualified individual based on disability, including "not making reasonable accommodations." 42 U.S.C. §§ 12112(a), (b)(5)(A). Employees can prove discrimination using

---

[2] Even if Shears did not waive his delay argument, he does not explain why Energy Harbor's requesting medical documentation from Shears in response to his disability-related complaints did not count as initiating the interactive process. And, although the record shows that Beahon did not interpret Shears's early complaints as a request for accommodation, Shears does not specify the time that elapsed between when he first requested the day shift based on his disability and when Beahon first requested a doctor's note. The record does reflect, however, that Energy Harbor acted promptly to honor the requests contained in the doctor's note and accommodated him accordingly. It is thus unclear where there is a material dispute of fact that could save this claim.

either direct or indirect evidence, and "each has its own test." *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022). Failure to accommodate is "expressly listed in the Act's definition of disability discrimination." *Id.* (citing 42 U.S.C. § 12112(b)(5)(A)). "[C]laims *premised* upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination," so we evaluate such claims under the direct-evidence framework. *Id.* (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). Thus, to establish a prima facie failure-to-accommodate case, Shears must show that (1) he had a qualifying disability; (2) "[he] was otherwise qualified for [his] position, with or without reasonable accommodation"; (3) Energy Harbor "knew or had reason to know" of his disability; (4) he requested an accommodation; and (5) Energy Harbor failed to provide one. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.,* 974 F.3d 652, 669 (6th Cir. 2020).

Shears did not attempt to adapt his reframed argument to the prima facie test. Instead, he pointed to *McPherson v. Michigan High School Athletic Association*, 119 F.3d 453 (6th Cir. 1997) (en banc), and *Equal Employment Opportunity Commission v. Dolgencorp, LLC*, 899 F.3d 428 (6th Cir. 2018). Both cases are inapposite, however. Shears first cited *McPherson* for the proposition that "[f]ailure to consider the possibility of reasonable accommodation for [known] disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities." 119 F.3d at 460 (alterations in original) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995)). But his reliance on *McPherson* is misplaced.

In *McPherson*, a student was prohibited from participating in interscholastic athletic competition because of an athletic association rule that barred students enrolled for longer than eight semesters from participation in sports competitions. *Id.* at 455–57. The student, who had

been diagnosed with a disability after he had exhausted his athletic eligibility, sought a waiver from the rule based on his new diagnosis but was denied. *Id.* at 456–57. He sued for violations of the ADA and the Rehabilitation Act. *Id.* at 457. We concluded that the student failed to make a claim under either the ADA or the Rehabilitation Act because the defendant did not promulgate the eligibility rule with the intent of barring students with learning disabilities from participation, and the defendant could not have reasonably accommodated the student's disability. *Id.* at 461–63.

*McPherson* did not meaningfully address—much less apply—the prima facie elements for an employment failure-to-accommodate claim. Nor did it establish some alternative test for failure-to-accommodate claims. Not only is *McPherson* not an employment discrimination case, but it also does not involve a situation like the one Shears contemplates. That is, *McPherson* does not involve a plaintiff being penalized for misconduct arising from his disability as a result of a defendant's failure to accommodate. The language Shears quotes was dicta, divorced from its context, and it does not relieve him of the obligation to satisfy the established prima facie elements for an ADA employment claim. Therefore, *McPherson* does not save his claim.

Shears's belated reliance on *Dolgencorp* is equally unavailing. There, a diabetic grocery store employee took and drank bottles of orange juice without paying for them first. *Dolgencorp*, 899 F.3d at 432. Though the employee paid for the juices after-the-fact, Dolgencorp fired her for violating the store's policy forbidding employees from consuming merchandise before paying for it. *Id.* The employee sued for disability discrimination, claiming, in relevant part, a failure to accommodate, since the store had denied an earlier request to keep orange juice at the register to manage her hypoglycemic episodes. *Id.* Dolgencorp challenged the jury's verdict in favor of the employee. The company argued that it had no duty to accommodate because the employee could

treat her hypoglycemia in other ways. *Id.* at 434. We upheld the jury's verdict, explaining that the employee had asked for an accommodation which Dolgencorp categorically denied without considering any alternatives. *Id.* at 434–35. Shears's case is distinguishable on the facts. Unlike in *Dolgencorp*, Energy Habor did not categorically deny Shears's request to move to the day shift. Instead, it requested a doctor's note, which it was entitled to do. *See Kellar v. Yunion, Inc.*, 157 F.4th 855, 876 (6th Cir. 2025) (citing *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 813 (6th Cir. 2020)). And after receiving his doctor's note, the company moved Shears to the day shift. So *Dolgencorp* does not lead us to disturb the district court's decision.

Given his abandonment of the delay theory and his concession that Energy Harbor provided the requested accommodation after receiving the April 3 doctor's note, Shears cannot show that Energy Harbor failed to accommodate him.

## B. Disability Discrimination

Next, Shears claims that Energy Harbor discriminated against him by terminating his employment shortly after granting him a medical accommodation. Under the ADA, it is unlawful for an employer to discharge an employee because of their disability. 42 U.S.C. § 12112. Where, as here, the plaintiff relies on circumstantial evidence of discrimination, we apply the *McDonnell Douglas* burden-shifting framework to evaluate the employee's claim. *Hrdlicka*, 63 F.4th at 566. Under this framework, a plaintiff can establish a prima facie case by showing that: (1) he is disabled; (2) he is otherwise qualified for the position; (3) he suffered an adverse employment action; (4) the employer knew or had reason to know of his disability; and (5) his position remained open or he was replaced. *Id.* at 566–67. If the plaintiff establishes his case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination. *Id.* at 567.

The burden then returns to the plaintiff to show that the stated reason was a pretext for discrimination. *Id.*

The parties do not dispute Shears's prima facie case. Energy Harbor does, however, assert that it terminated Shears for a legitimate, nondiscriminatory reason: falsifying time records during the March 2019 outage. And we have repeatedly recognized that timecard falsification is a valid basis for termination. *See Hudson v. City of Highland Park*, 943 F.3d 792, 802 (6th Cir. 2019); *see also Green v. Cent. Ohio Transit Auth.*, 647 F. App'x 555, 562 (6th Cir. 2016).

Shears contends that Energy Harbor's stated reason for termination is pretextual. Shears can establish pretext by showing that the proffered reasons for his termination "(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Hrdlicka*, 63 F.4th at 569 (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)). These categories are non-exhaustive, and the "ultimate inquiry" is whether "the employer fire[d] the employee for the stated reason or not." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (citation omitted). Shears invokes all three theories, none of which we find persuasive.

*1.      Basis-in-Fact*

First, Shears claims that Energy Harbor's reasons for his termination have no basis-in-fact. To show that the defendant lacked a factual basis for its proffered reason for termination, the plaintiff must show that "the employer's allegations never happened." *Miles*, 946 F.3d at 888–89. The relevant question, at its core, is whether Energy Harbor "made up its stated reason to conceal intentional discrimination." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326–27 (6th Cir. 2021) (citation omitted). But the record confirms that discrepancies indeed existed between Shears's timesheets and his badge data.

After the March 2019 outage, Beahon noted that Shears frequently reported 13-to-14-hour workdays in the timekeeping system. This prompted Beahon to conduct an audit comparing Shears's reported hours with badge-swipe data from the plant's protected area, where Shears was assigned to work during the outage. Beahon retrieved Shears's badge access records from plant security, which logged every entry into and exit from the protected area. He found twenty-one discrepancies across twenty-six days. On ten occasions, Shears overstated his work time by more than 30 minutes, with discrepancies ranging from 32 to 106 minutes. For example, Shears reported working 13 hours on March 6, but the badge system showed he was in the protected area for only 12 hours and 7 minutes. On March 8, he reported 9 hours while his badge data showed a little more than 7 hours. Beahon documented the discrepancies in a spreadsheet and submitted the findings to HR and upper management, who then terminated Shears for falsification.

Shears maintains that the alleged discrepancies were not the result of intentional dishonesty, and he offers eight separate arguments that he says undermine the factual basis for Energy Harbor's stated reason for discharging him. First, he argues that Energy Harbor's failure to consider a reasonable accommodation when terminating him for his performance problems is "nothing more than a termination because of the disability." (Appellant's Br., ECF 19, 22). Although he raises this argument to assert lack of a factual basis for his falsification of time, Shears does not deny that he misreported his time. Instead, he contends that any such misconduct is excusable because Energy Harbor failed to accommodate him, resulting in performance issues stemming from the disability.

In support of this argument, Shears again points us to language from *McPherson*, stating that the "[f]ailure to consider the possibility of reasonable accommodation for [known] disabilities" is a discharge "solely because of the disabilities" if the lack of accommodation leads

to a discharge for performance problems stemming from the disabilities. 119 F.3d at 460 (alterations in original) (citation omitted). But context matters. The quoted language served the purpose of bridging the analytical landscape between non-employment-related and employment-related ADA cases for establishing a plaintiff's prima facie case. *See id.* And just as in his accommodation claim, *McPherson* does not reach the framework necessary for our analysis. Indeed, *McPherson* did not analyze pretext. So it is hard to discern how this general guiding principle on establishing causation translates into the defeat of an employer's legitimate non-discriminatory explanation. Moreover, Shears points us to no case that has acknowledged or extended *McPherson*'s causation discussion to overcome a legitimate, non-discriminatory reason for discharge. Because of this, *McPherson* is inapposite, and Shears's argument misses the mark.

In his next six reasons, Shears argues that the district court impermissibly resolved factual disputes in Energy Harbor's favor. Specifically, he contends that he provided evidence that Energy Harbor relied on selective data; overlooked his understatements of time; ignored internal records suggesting the errors could have been "an honest mistake"; disregarded inconsistent testimony from its own witnesses; departed from its disciplinary policies; and failed to investigate whether his diabetes may have caused his timecard errors despite having medical documentation in hand. But ultimately, he does not dispute the underlying badge data or deny that discrepancies on his timecards existed. And because his "argument[s] go[] toward explaining the discrepancies[,] [they] do[] not render the discrepancies factually baseless in the first place." *Gray v. State Farm Mut. Auto. Ins. Co.*, 159 F.4th 1024, 1035 (6th Cir. 2025). His arguments therefore fail on a basis-in-fact theory.

Finally, Shears challenges the district court's application of the honest-belief rule. Under the honest-belief rule, a defendant may rebut a plaintiff's argument that the defendant's asserted

reason lacks a basis in fact by showing that the defendant "'honestly believed' its proffered reason, and that the belief was reasonably based 'on particularized facts that were before it at the time the decision was made.'" *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) (citation omitted). To establish honest belief, a plaintiff must show "more than a dispute over the facts upon which the discharge was based." *Seeger*, 681 F.3d at 285 (citation omitted). "[T]he employer's decision-making process" need not "be optimal," and the employer is not required to have "left no stone unturned." *Id.* (citation omitted). "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citation omitted). Shears contends that Energy Harbor's reliance on the timecard investigation was not reasonable because it ignored evidence that his timesheet errors were nothing more than honest mistakes. He generally references the reasons outlined above to suggest that there is "substantial evidence" showing that "Beahon was aware of information that would make it impossible for him to honestly believe Shears had falsified his time sheets." (Appellant's Br., ECF 19, 28–29).

But Energy Harbor made a reasonably informed and considered decision to terminate Shears following an adequate investigation involving various levels of review. Beahon conducted a timecard audit based on badge-swipe data, logged the results in detail, and escalated the matter to Clark. Clark instructed Beahon to conduct a fact-finding interview with Shears, ensuring another manager was present. So Beahon and Sutter interviewed Shears about his timesheets. The investigation then escalated to Clark, who reviewed the gate entry and exit times, which were contained in a transaction report provided by security. Clark agreed, based on Beahon's characterization of the interview, to recommend termination. Although Clark appeared to rely on Beahon's findings, the SCWRT engaged in its own separate investigation. The SCWRT met twice

with Clark and Beahon about the investigation into Shears's timesheets and requested additional information from them to aid in their decision-making process. Prior to his termination, Shears also had conversations about the time reporting issues with the SCWRT by way of Ordonez. The SCWRT concurred with Clark and Beahon's recommendation to terminate. The company ultimately concluded that Shears "knowingly" violated company policy.

This type of investigation passes muster for purposes of the honest-belief rule. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) ("When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." (internal quotation marks and citation omitted)). Moreover, Shears points to no evidence suggesting that Energy Harbor did not actually believe the substance of its investigation. At most, the only evidence Shears identifies to suggest that Energy Harbor was aware that the timesheet discrepancies were an honest mistake is a letter from a doctor explaining that Shears's medical condition was impacting his judgment. But the record shows that this letter was dated May 8, 2019 and signed at 6:22PM after his termination and the investigation. All in all, the record reflects that Energy Harbor made a reasonably informed and considered decision before terminating Shears.

### 2. *Motivation of Discharge*

Second, Shears argues that even accepting that timekeeping discrepancies occurred, those discrepancies did not actually motivate his termination. To demonstrate that an employer's proffered reason did not actually motivate an adverse employment action, a plaintiff can "attack[] the employer's explanation by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant." *Hartman v. Dow Chem. Co.*, 657 F. App'x

448, 453 (6th Cir. 2016) (emphasis in original and internal quotation marks omitted) (quoting *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000)).  Suspicious timing can be a strong indicator of pretext when it is accompanied by other circumstantial evidence.  *See Seeger*, 681 F.3d at 285.  Shears shows neither illegal motivation nor other circumstantial evidence showing pretext.  He argues only that Energy Harbor's accusations that the errors were willful is too "ridiculous" to have motivated its decision to terminate him and that the "punishment did not fit the crime." (Appellant's Br., ECF 19, 29).  But he does not adequately develop either argument.

First, Shears offers no evidence that Energy Harbor's belief that his errors were "willful" is so implausible that a jury could find it pretextual.  Instead, he circles back to his argument that the alleged errors were more consistent with an honest mistake caused by Energy Harbor's failure to provide him with the accommodation he needed.  But, as we already noted, he offers no evidence to show that Energy Harbor knew enough to connect the performance problems to the disability.  As previously discussed, the doctor's note explaining that Shears's disability could cloud his judgment and cause confusion that could affect his work performance came in after Energy Harbor had already concluded its investigation and discharged Shears.  And even if Shears communicated to Beahon that the nightshifts were exacerbating his disability, that information was not enough to put Beahon on notice that the disability was causing performance issues.  This is particularly true given that Shears communicated to Beahon during the fact-finding interview that his disability was not impacting his ability to do his job.

Second, Shears argues that the "punishment did not fit the crime," as it was unreasonable for Energy Harbor to skip its own general progressive-discipline policy for a "first time, unconfirmed offense." (Appellant's Br., ECF 19, 29).  As a threshold matter, the record does not contain the actual company policy.  On this issue, we have only Beahon's testimony that

progressive discipline would ordinarily entail starting off with coaching, moving to non-verbal, proceeding to documentation, and then eventually reaching termination if the situation required it. At the same time, Beahon also testified that "any level of progressive discipline can be jump[ed] based off of severity." (Beahon Dep., R. 40-1, PageID 733). Neither party elaborates as to what level of "severity" warrants certain "jumps" in the progression.

Importantly, Shears carries the burden of proof. Yet he offers no evidence that Energy Harbor deviated from its normal policies. He merely points to a line of questioning in Clark's deposition suggesting that Energy Harbor does not typically terminate employees for honest mistakes in timekeeping, such as selecting the wrong payroll code. But Clark clarified that such leniency does not extend to intentional falsification. And, here, Energy Harbor expressly determined that Shears intentionally falsified his timesheets. (*See* Exhibit 25, R. 39-5, PageID 598). Without evidence that Energy Harbor's stated reason was implausible or that it deviated from its normal disciplinary practices in a way that suggests discrimination, Shears cannot show that the alleged timekeeping violations did not actually motivate his termination.

### 3. Sufficient to Warrant Termination

Finally, Shears contends that even assuming some discrepancies occurred, they could not justify termination, particularly given his nearly three decades of unblemished service. To survive summary judgment under this final pretext theory, Shears must show that a reasonable jury could find Energy Harbor's proffered reason "insufficient to motivate [his] discharge." *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008). In essence, "[d]emonstrating pretext often consists of 'raising the question of why [the plaintiff] was singled out' for an adverse employment action." *Strickland v. City of Detroit*, 995 F.3d 495, 512 (6th Cir. 2021) (second alteration in original) (quoting *George v. Youngstown State Univ.*, 966 F.3d 446,

462 (6th Cir. 2020)). Plaintiffs can advance this theory by showing that "other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 624 (6th Cir. 2024) (quoting *Madden*, 549 F.3d at 676).

Shears claims that Energy Harbor failed to discipline other employees for the same or substantially worse conduct. On this point, he contends that Energy Harbor did not terminate other employees who had timesheet errors. A comparator need not be identical to the plaintiff but must be similarly situated "in all *relevant* respects." *Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 511 (6th Cir. 2022) (emphasis in original) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)). Examples of relevant considerations include "job title, responsibilities, experience, and work record." *Id.* at 512 (citation omitted). We may also consider whether the plaintiff and the proposed comparator engaged in the same conduct, without any distinguishing or mitigating circumstances that would justify different treatment by their employer. *Id.* But the plaintiff needs to show more than "[s]uperficial similarities." *Id.* at 511 (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 604 (6th Cir. 2008)). Rather, the plaintiff must show that he and the comparator "engaged in acts of *comparable seriousness*." *Id.* at 512 (citation modified and emphasis in original) (quoting *Wright*, 455 F.3d at 710). It is not enough that two employees each received a warning or negative performance review; the underlying issues must be comparable in substance. *Id.*

The district court correctly held that Shears failed to provide sufficiently detailed evidence about the other employees with intentional timesheet errors and how their errors compared to the inaccuracies on Shears's timesheets. This is fatal to Shears's argument because he fails to support

a contention that these employees' errors were of the same magnitude as his. Shears points to a couple of comparators by name. But he has not demonstrated that either proposed comparator is similarly situated to him.

Begin with Bruce Renton. Shears points out that Renton received only a verbal warning for timecard errors. Although the parties do not dispute that Renton had timecard infractions, Shears offers virtually no other details to show that he and Renton were otherwise similarly situated. True, Renton had extra overtime charged over a two-week period that did not match with his timecard stamps. But the record is void of any information about the severity of those discrepancies and how they compared to Shears's. And one significant fact distinguishes Renton's situation from Shears's—Energy Harbor's good faith determination that Shears acted dishonestly. Beahon testified that the decision to terminate Shears "came down to an integrity issue about lying and falsification of documentation." (Beahon Dep., R. 40-1, PageID 739). The difference in how each man responded when confronted with the time sheet discrepancies led to different conclusions about their honesty. Shears's response, Energy Harbor determined, supported a finding of dishonesty that it contends led to Shears's termination.

Shears also points to Jamie Platt, a supervisor in the I&C department who allegedly "made his own hours and worked as much overtime as he wanted to without approval." (Shears Dep., R. 40-3, PageID 968). But Shears's issue is not that he worked overtime without approval. The issue is that he allegedly falsified his hours. And Shears was unable to provide any other information to show that he and Platt were similarly situated. All in all, the district court did not err in concluding that Shears failed to show evidence of disparate treatment as compared to similarly situated employees.

Shears also points to alleged discrepancies in how Beahon responded to and investigated other types of misconduct, such as harassment, in an effort to use worse conduct as a comparator. (*See* Exhibit 21, R. 39-5, PageID 593–94). For example, Shears avers that Beahon issued John Pantani a three-day suspension for making inappropriate comments in violation of the sexual harassment policy. But Shears offers no other details about these allegations or any investigation into Pantani's conduct such that the court can evaluate whether the underlying conduct was comparable in seriousness or whether Pantani or other employees he references were similarly situated in terms of job duties, disciplinary history, or the nature of the infractions. Since Energy Harbor based Shears's termination on dishonesty, any meaningful comparator must have also been found to engage in similar dishonest conduct. Shears has not made such a showing. For these reasons, the district court did not err in concluding that Shears failed to raise a genuine dispute of material fact under this theory of pretext.

### C. Retaliation

Finally, Shears claims that Energy Harbor retaliated against him for engaging in protected activity. He identifies two bases for this claim: (1) that he requested an accommodation for his diabetes; and (2) that he participated in internal HR investigations for sexual harassment and hostile work environment caused by supervisors, including Beahon. Under the ADA, an employer may not discriminate against an employee for requesting an accommodation or opposing unlawful practices. 42 U.S.C. § 12203(a). Like his discrimination claim, we evaluate Shears's retaliation claim using the *McDonnell Douglas* framework. *Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 767 (6th Cir. 2025). Under that framework, a plaintiff must first demonstrate a prima facie case of retaliation by showing that (1) he engaged in protected activity, (2) the defendant knew of

the activity, (3) the defendant took an adverse action against the plaintiff, and (4) there was a causal connection between the adverse action and the protected activity. *Kirilenko-Ison*, 974 F.3d at 661.

Energy Harbor concedes that Shears engaged in protected activity and that his termination was an adverse employment action. The parties, however, dispute the remaining elements—employer knowledge and causation. Shears argues that he has established both knowledge and causation via the Cat's Paw theory. Under that theory, the retaliatory intent of a subordinate with knowledge of the plaintiff's protected activity can be imputed to the final decisionmaker. *See Bose v. Bea*, 947 F.3d 983, 990 (6th Cir. 2020). So, according to Shears, Beahon's knowledge of both his request for accommodation and his participation in the investigation of coworkers' discrimination claims against Beahon, combined with Beahon's recommendation to Clark to discharge Shears (thereby bypassing Energy Harbor's progressive discipline framework) establish Beahon's knowledge and retaliatory intent. And because Clark relied on Beahon's recommendation in his decision to terminate Shears, Beahon's knowledge and intent should be imputed to Clark. Add to that, says Shears, the temporal proximity between his protected activity and his discharge, and he has satisfied all the elements of a prima facie claim. In response, Energy Harbor asserts that Shears's misconduct broke any causal connection. And it raises factual disputes, which we cannot resolve: Beahon did not know about Shears's assistance to the complaining employees; and Clark did not know about Shears's participation in the resulting investigation into Beahon's conduct. In the end, we need not settle this issue, as Shears's claim fails at a later stage, regardless.

Even assuming, as the district court did, that Shears can make out a prima facie case of retaliation, his retaliation claims falter for the same reasons as his disability discrimination claim: his failure to show that Energy Harbor's legitimate, non-retaliatory explanation for his discharge

was a pretext for unlawful conduct.   Because the adverse action he asserts for both the discrimination claim and the retaliation claims is his discharge, the pretext analysis remains the same.   Indeed, both parties concede as much.   As Shears has not established that Energy Harbor's proffered reason for his termination is pretextual, the district court did not err in granting Energy Harbor's motion for summary judgment as to Shears's claims for unlawful retaliation.

**IV.**

We **AFFIRM**.